DETERMINED IN

# THE SUPREME COURT

OF THE

# TERRITORY OF ARIZONA,

## JANUARY TERM, 1874.

---

JOHN A. RUSH AND ALONZO E. DAVIS, RESPOND-
ENTS, v. WASHINGTON FRENCH AND WILLIAM
A. LINN, APPELLANTS.

OBJECTIONS, WHAT THE RECORD MUST SHOW IN REFERENCE TO.—Where a
party objecting is overruled and he appeals, he must show by the record:
1. What the question was and what answer was given to it, or what the
evidence was which was introduced against his objection. 2. He must
set out enough of the evidence to illustrate the point of his objection,
and to raise the presumption that he may have been injured; but where
error is shown, injury will be presumed, unless the contrary clearly ap-
pears. 3. He must show what kind of an objection was made, and, to
avail him in the supreme court, he must show that the objection, as
made, was good.
ID.—Where the party objecting is sustained and the other side appeals, the
appellant must show by the record: 1. What question he asked, and
what evidence he sought to introduce. 2. Sufficient of the other evi-
dence to illustrate the admissibility of that offered. 3. That the evi-
dence so offered was excluded. 4. That there is reasonable ground to
presume that he may have been injured by such exclusion.
SUPREME COURT WILL CONSIDER ONLY SUCH GROUNDS OF OBJECTION as
were urged in the court below. Such objection must be specific, not

general. It is error to sustain a general objection, unless it is impossible that the evidence offered can be material in any view of the case, and this impossibility must be apparent.

OBJECTION THAT TESTIMONY OFFERED IS IRRELEVANT, INADMISSIBLE, OR INCOMPETENT, without specifying wherein or how, or why it is irrelevant, inadmissible, or incompetent, will not be considered in the supreme court as raising any issue, if the testimony could, under any possible circumstances, have been relevant, admissible, or competent.

. CROSS-EXAMINATION, LIMITS OF.—1. When an adverse witness has testified to any point material to the party calling him, he may then and there be fully cross-examined and led by the adverse party upon all matters pertinent to the case of the party calling him, except upon exclusively new matter; and nothing is deemed new matter except such as could not be given under a general denial. 2. The fact that evidence called forth by a legitimate cross-examination happens also to sustain a cross-action or counter-claim, affords no reason why it should be excluded. 3. The party entitled to cross-examine may waive his right to do so at the time, and recall the witness and cross-examine him after he opens his case. 4. The court, in its discretion, may forbid the cross-examining party putting leading questions, when the objection is made that the witness is biased in favor of the party cross-examining, and the court is satisfied that the objection is well founded.

IN EJECTMENT IT IS NOT NEW MATTER to set up defendant's title.

LAW AND CUSTOMS OF MINERS PERMIT LOCATIONS TO BE MADE FOR NON-RESIDENTS of the district, and when so made, the title vests in the person for whom they are made.

DECLARATIONS OF GRANTOR AS TO NATURE OF TITLE HE ASSERTS, made during the time that he claimed title, are admissible, not only against himself, but against parties claiming under him.

FORFEITURE OF MINING CLAIM.—A failure to comply with the local rules and customs of the miners of a district will not work a forfeiture of a mining claim, unless those rules and customs expressly declare that such failure shall work a forfeiture, and such local rules and customs, instead of being liberally construed to establish such forfeiture, will be strictly construed as against it.

LOCAL RULES AND CUSTOMS OF MINERS, INTERPRETATION OF.—The local rules and customs of miners are subject to exactly the same rules of construction and interpretation as any other statute.

LEGAL TERMS MUST NOT BE USED IN INSTRUCTIONS WITHOUT EXPLANATION.

WHEN LOCATION OF MINING CLAIM IS MADE FOR ABSENT LOCATOR, whether with or without authority, or with or without his knowledge, whatever rights are given to him by such location vest in him at once, and even the person locating such absentee can not, without authority, take down the name of such absentee and insert another, even if he do it before the absent locator has knowledge of the fact that he has been located. No express authority is requisite for a person to locate an absent party.

POSSESSORY RIGHTS, WHAT NECESSARY TO MAINTAIN EJECTMENT.—There are two kinds of possessory rights recognized in this territory, one based on the act of November 9, 1864, Compiled Laws, p. 536, the other resting on mere prior occupation. To maintain a right under the first, plaintiff must show a compliance with the statute; to succeed under the second,

he must show prior possession without alienation or abandonment, down to the time of the entry complained of.

FRAUD, WHAT NECESSARY TO DEFEAT RIGHTS OF ABSENT LOCATOR.—In order to render a location void as to an absent locator on the ground of fraudulent intent upon the part of those locating him, it is necessary to bring a knowledge of such fraudulent intent home to such absent locator, and to show an acquiescence in such fraudulent intent upon his part, with the purpose of carrying it out.

IT IS NOT ERROR TO REFUSE INSTRUCTION HAVING NO RELEVANCY to any question involved in the issue. Whether or not it is error to give such an instruction depends upon whether it is calculated to mislead the jury or not.

WHERE ERROR IS SHOWN, INJURY IS PRESUMED, unless the contrary plainly appears.

APPEAL from the third judicial district, county of Yavapai. The opinion states the case.

*Joseph P. Hargrave and Coles Bashford,* for the appellants.

The court erred in refusing to permit defendants to cross-examine Mary E. Sawyer as to facts showing that the claim was not open to location and appropriation, for the reason that it had been previously located by Linn, to wit: 1. That there was a notice on the monument on which she placed her notice, which she tore down; 2. What she found on the monument at the time she placed her notice there; 3. Was the claim known as the Linn claim? 4. Did she see any work done on the claim at the time she made her location? 5. Was anybody else at work on the claim whilst she was at work there?

This was proper on cross-examination, as showing that plaintiffs' grantor had not located the mining claim, because it was not open for location and appropriation, and for the purpose of sifting the witness as to the evidence she had given. 1 Greenl. 492, 493, sec. 445, *et seq.;* Compiled Laws, p. 524; *Jackson* v. *Varick,* 7 Cow. 238; *Beal* v. *Nichols,* 2 Gray, 264; *Jackson* v. *Feather R. W. Co.,* 14 Cal. 24, 25; *Hawkins* v. *Borland,* Id. 413; *Marshall* v. *Shafter,* 32 Id. 190; *Harper* v. *Lamping,* 33 Id. 641; *Ferguson* v. *Rutherford,* 7 Nev. 385; *Reed* v. *Clark,* 47 Cal. 194.

If evidence is pertinent to the issue, and the objection is to the order of proof, the objection must so state.

The court erred in rejecting the evidence offered by defendants to prove that plaintiffs knew that the work on the

claim had been done by Linn, and that they had examined the records and knew of defendants' title and location of this claim.

The court erred in rejecting the following question put by defendants to the witness: "What authority, if any, did you ever give Mr. French to make location of mining claims for you in this territory prior to the location of the Tiger mine?"

The court erred in rejecting the following evidence: Witness testified to the destruction, or loss, of a letter, and defendants offered to prove the contents. 1 Greenl. 595, 596, sec. 558.

The court erred in rejecting the following question: "For what purpose did you request Linn to send you a deed of the premises in controversy, or a power of attorney?" Not offered to impeach deed or power of attorney, but for the purpose of explaining the reason of their execution.

The court erred in rejecting the following evidence: The defendants offered to purge the whole transaction of any suspicion of fraud in the location of the mine and their conduct subsequent thereto, but the evidence was objected to by plaintiffs and excluded by the court, yet the court submits the question to the jury whether the claim was located for the benefit of French and Moreland.

The court erred in rejecting the evidence offered by defendants to prove the declarations and admissions of the grantor of plaintiffs, Mary E. Sawyer, at the time of the pretended location of the mine by her, that she located because Linn was a non-resident, thereby admitting that Linn's claim was otherwise regular and valid, and that she knew it. *Stanley* v. *Green*, 12 Cal. 148, 162, 163; 1 Greenl., secs. 108, 191; *Bollo* v. *Navarro*, 33 Cal. 466.

The court erred in rejecting the following evidence: "State what are the general usages and customs of miners in making locations of mining claims in unorganized districts." Witness states that her knowledge is confined to this county. Evidence excluded by the court. "What is the general usage and customs of miners in like places in regard to the discovery of mines in making locations for other parties not present?" Both questions objected to and evidence excluded. Sec. 1, U. S. M'g Law of 1866–72; Yale on Mines, 63, and authorities there cited.

The court erred in refusing to give the following instruction, as requested by defendants: "The failure to comply with the local rules and customs of the district will not work a forfeiture, unless such failure is declared by such rules or customs to be forfeiture." Yale on Mines, 64; *McGarrity* v. *Byington*, 12 Cal. 431; *English* v. *Johnson*, 17 Id. 118; *Colman* v. *Clements*, 23 Id. 248; *Bell* v. *Bed Rock T. and M. Co.*, 36 Id. 219; *Bradley* v. *Lee*, 38 Id. 367.

The court erred in refusing to give to the jury the following instruction, as requested by defendants: "If defendants were in possession and occupancy of the claim in controversy at the time plaintiffs' grantor attempted to make her location, no right was acquired by such location." *English* v. *Johnson*, 17 Cal. 115, 116; *Attwood* v. *Fricot*, Id. 38; Yale on Mines, 64; *Hess* v. *Winder*, 30 Cal. 355.

The court likewise erred in interpolating the words "located and lawfully." It changes the whole meaning and intention of the instruction, and it became a different instruction.

Besides, it was using legal terms without explanation, which tended to mislead the jury. 3 Graham and Waterman on New Trials, pp. 707, 708, 773, 774; Hilliard on New Trials, p. 267, sec. 23; *People* v. *Byrnes*, 30 Cal. 206.

The court erred in refusing to give the following instruction, as requested by the defendants: "If the acts done by and under the direction of Mr. French, for and in the name of Linn, in the location and appropriation of the mine in controversy, would, if done by Linn in person, constitute a good and valid title to the premises, according to the local rules and customs of the district, the subsequent ratification and occupation by Linn make them his own acts, and invest him with all the rights which he would or could have acquired if he had been personally present and had performed those acts in person."

This instruction should have been given without any qualification, and the court erred in adding the following to this instruction: "Unless a valid location by some other person had, in the interval between the location of French and the ratification by Linn, been made and perfected." Yale on Mines, 63; *Morton* v. *Solambo C. M. Co.*, 26 Cal. 527.

The court erred in refusing to give the following instruction to the jury, as requested by defendants: "And a location made by one person in the name of another vests a right in the one for whom the location is made, which can only be divested by his own act or omission or operation of law." *Morton* v. *The Solambo Co.*, 26 Cal. 527; Yale on Mines, 63.

The court erred in not giving the following instruction to the jury, as requested by defendants: "The law makes the discoverer of a mine the agent of those for whom he chooses to act, and his act becomes their act, regardless of the fact whether the party for whose benefit the location is made has any knowledge of it or not. In such cases, however, the agent making such location has no power afterwards to make any change in the same so as to affect injuriously the right of the party for whose benefit the location was made. Yale on Mines, 63; *Morton* v. *The Solambo Co.*, 26 Cal. 527.

The court erred in giving the following instruction, as requested by plaintiffs: "That if you believe from the evidence that plaintiffs were in possession of the premises in dispute, and that defendants entered and ousted them therefrom, you will find for plaintiffs, unless the jury believe from the evidence that defendants had a better right to the possession than that of plaintiffs."

The court refused to give the defendants the benefit of a like instruction.

The court erred in giving the following instruction, as requested by plaintiffs: "If the location of the mining claim in question was made in the name of Linn by Moreland and French, or either of them, for the purpose of having Linn convey to them, or either of them, the whole or any part of said mining claim, without any further consideration, Moreland and French having already located two hundred feet each on the same lode, and that Linn ratified the act for the purpose of making such conveyance, such location was void, as a fraud and evasion of law."

There being no evidence that Linn had ratified the act of location or made such conveyance for the purpose stated in said instruction, it was error to so instruct the jury.

The court erred in giving the following instruction to the jury: "If the location of the mining claim in question was

made in the name of Linn by Moreland and French, or either of them, for the purpose of having Linn convey to them, or either of them, the whole or any part of the said mining claim, without further consideration, Moreland and French having located two hundred feet each upon said lode, then the location was absolutely void, as made in fraud and evasion of law."

This declares the location to be void on the intention of Moreland and French, Linn not being a party to the fraud and not knowing of it.

There was no evidence to sustain the verdict of the jury. There was no conflict of evidence, and the evidence all tended to show that this claim was regularly located by Linn, and that this location was well known by Mary E. Sawyer at the time of her pretended location, and by the plaintiffs at the time of their purchase. A new trial should have been granted. Compiled Laws, p. 415, sec. 195, sub. 6; *Smith* v. *Athern*, 34 Cal. 511; *Maine Boys' T. Co.* v. *Boston T. Co.*, 37 Id. 50; *Moss* v. *Atkinson*, 44 Id. 16.

*Rush and Davis and J. E. McCaffry*, for the respondents.

The exceptions taken by the appellants in this case refer, for the most part, to questions touching the admissibility of evidence. The exceptions numbered in the transcript 1 to 9 were certainly not well taken. It is now well settled that matters not brought out on direct examination can not be inquired into upon a cross-examination. Story, J., in the supreme court of the United States, said: "Now certainly these statements, if objected to by the defendants, would have been inadmissible upon two distinct grounds." * * * 2. And secondly, upon the broader principle, now well established, though sometimes lost sight of in our loose practice at trials, that a party has no right to cross-examine any witness except as to facts and circumstances connected with the matters stated in his direct examination. If he wishes to examine him as to other matters, he must do so by making him his own witness, and calling him as such in the subsequent progress of the cause." *Philadelphia and Trenton R. R. Co.* v. *Stimpson*, 14 Pet. 461; *Floyd* v. *Bovard*, 6 Watts & S. 75.

The next exceptions (numbered from 9 to 12 in the tran-

script in this case) are fully as untenable. The appellants proved that one of them (Linn) received from the other (French) certain letters; that after the institution of this suit Linn voluntarily and deliberately destroyed the letters. The appellants at the trial offered to prove the contents of these letters by the parol evidence of said Linn.

Thompson, J., said, in a case decided by the supreme court of the United States: "The rule of evidence with respect to the admission of secondary evidence must be so applied as to promote the ends of justice and guard against fraud or imposition. If the circumstances will justify a well-grounded belief that the original paper is kept back by design, no secondary evidence ought to be admitted." *Renner* v. *The Bank of Columbia*, 9 Wheat. 596, 597; 5 Cond. Rep. 691.

"Secondary evidence," says Heydenfeldt, J., "must always be received with caution, and then not until every means is shown to be exhausted in the effort to procure that which is superior." *Norris* v. *Russell*, 5 Cal. 251.

The case of *Bagley* v. *McMickle*, 9 Cal. 446, 447, is, perhaps, more in point than those just cited. In that case Field, J., delivered the opinion of the court. He says: "It is not a matter of course to allow secondary evidence of the contents of an instrument in suit upon proof of its destruction. If the destruction was the result of accident, or was without the consent of the owner, such evidence is generally admissible. But if the destruction was voluntary, or was deliberately made by the owner, or with his assent, as in the present case, the admissibility of the evidence will depend upon the cause or motive of the party in effecting or assenting to the destruction. The object of the rule of law which requires the production of the best evidence of which the facts sought to be established are susceptible is the prevention of fraud; for if a party is in possession of this evidence, and withholds it, and seeks to substitute inferior evidence in its place, the presumption naturally arises that the better evidence is withheld for fraudulent purposes, which its production would expose and defeat. When it appears that this better evidence has been voluntarily and deliberately destroyed, the same presumption arises, and unless met and overcome by full explanation of the circumstances, it becomes conclusive of a fraudulent design, and all secondary

or inferior evidence is rejected." *Riggs* v. *Tayloe*, 9 Wheat. 483; *Blade* v. *Noland*, 12 Wend. 173; S. C., 27 Am. Dec. 126; *Bank of the U. S.* v. *Sill*, 5 Conn. 106; S. C., 13 Am. Dec. 44. "Parol evidence to show facts stated in certain letters received by the witness will not be admitted; the letters should be produced." *De Tastett* v. *Crousillat*, 2 Wash. C. C. 132. "The contents of letters must be proved by the production of the letters themselves, unless their absence be accounted for." *Hackleman* v. *Moat*, 4 Blackf. 164.

The exceptions numbered in the transcript from 13 to 26 and 31 are as untenable. They relate to an attempt made by the defendants to set up an agreement between the defendants Linn and French, different in its terms from that exhibited by the power of attorney and deed from Linn to French.

There is no principle better settled than that parol evidence is not admissible to vary, explain, or contradict an agreement in writing. *Lennard* v. *Vischer*, 2 Cal. 37; *Conner* v. *Clark*, 12 Id. 168; *Faw* v. *Marsteller*, 2 Cranch, 10; *Mechanics' Bank* v. *Bank of Columbia*, 5 Wheat. 326; *Phillips* v. *Preston*, 5 How. 278; *Singleton* v. *Fore*, 7 Mo. 515; *Lane* v. *Price*, 5 Id. 101; *Rinaldi* v. *Rives*, 1 Stew. (Ala.) 174; *Falconer* v. *Garrison*, 1 McCord, 209; *Perrine* v. *Cheeseman*, 6 Halst. 174; S. C., 19 Am. Dec. 388; *Bennett* v. *Hubbard*, Minor (Ala.), 270; *Philips* v. *Keener*, 2 Overton (Tenn.), 329; *Woodruff* v. *Frost*, 2 N. J. L. 342.

The intention of a principal in a power of attorney can not be shown by parol evidence to differ from that shown by the power. *Peckham* v. *Lyon*, 4 McLean, 45. Parol evidence is inadmissible to establish a term or condition of a written contract.

By Court, DUNNE, C. J.:

This was an appeal from the third district court, Yavapai county, the judge of the second district presiding. It was an action of ejectment to recover possession of a certain mining claim known as the first north extension of the Tiger lode, or vein, in Tiger mining district, Yavapai county, Arizona territory. Tried at the June term, 1874. Judgment below for plaintiff. New trial refused. Defendants appeal from the judgment and order refusing new trial. Appeal heard January term, 1875.

On the tenth of January, 1871, D. C. Moreland located for himself and others one thousand two hundred feet as the original location on the Tiger vein. On the same day he located two hundred feet on the same vein, and immediately adjoining the original location on the north, for the defendant Linn. This last location constitutes the premises in controversy, and was known as the first extension north of the Tiger claim.

One of Moreland's co-locators in the original claim was the defendant Washington French. French and Linn were very intimate friends. They had traveled and prospected together in Montana, Utah, and Arizona as far back as in 1866. In May, 1869, they were at Fort Whipple, in Arizona, near where the premises in controversy are situated. At this time they separated, Linn going to White Pine in Nevada, where there had arisen a great excitement about mines, French remaining in Arizona. At the time of this separation it was agreed between them that if Linn found anything that would justify it, French was to be located with him, and that if French found anything in Arizona that would justify it, he was to inform Linn, and Linn would return. French had furnished Moreland, the discoverer of the Tiger lode, with supplies to enable him to hunt for new mines, and he was to have an interest in all discoveries made by Moreland for so doing. After Moreland reported the discovery and location of one thousand two hundred feet on the Tiger lode, French requested him to make a location on the same lode for Mr. Linn, which Moreland did, as before stated.

On the same day that the original location of one thousand two hundred feet and the first extension north of two hundred feet for Linn were made on the Tiger lode, Moreland also made another location of four hundred feet on the same claim next north of the Linn location for one Daniel Thorne and one John Cassidy, called sometimes the Thorne and Cassidy claim, and sometimes the second north extension on the Tiger.

This location was made by Moreland for Thorne and Cassidy, under an agreement with Moreland alone that they would deed back to Moreland one half of the ground for his trouble. This agreement was entered into before the location was made, but the agreement was not an agreement to

deed back any particular part of the location of four hundred feet, but generally to deed back one half the ground to pay him for his trouble, and Moreland was the only party known to Thorne and Cassidy in this agreement.

As a matter of fact, the deed presented by Moreland to Thorne and Cassidy for their signatures, and executed by them, was a deed to Moreland and his co-locators in the original Tiger location, and conveyed, not an undivided interest of two hundred feet in the Thorne and Cassidy location, but a segregated interest of the south half of their location, to wit, two hundred feet next adjoining the Linn location.

Plaintiffs attach importance to these facts, claiming that they tend to show a fraudulent intent upon the part of the original locators sufficient to vitiate the Linn location, and to allow the location of the plaintiffs' grantor to come in.

Some thirty days before the Tiger mine was discovered and located, French wrote to Linn, in Nevada, informing him about the arrangement for prospecting, and stating that, if anything was found that would justify it, he would locate him. Two days after the location was made, to wit, on the twelfth day of January, 1871, French wrote Linn, informing him that he had located a claim for him on a silver lead in Bradshaw (meaning this Tiger lode); he told him that the lead was twelve feet wide, assayed one thousand three hundred and fifty dollars per ton, and that he thought that the location made for him (Linn) would be good for ten thousand dollars in less than a year; that as soon as he, French, got the claim recorded, he would send Linn the name and number, and he wanted Linn to send a deed of it back to him, and he would hold it for Linn, who should have all it would bring.

Fifteen days after, to wit, on the twenty-seventh of January, 1871, French again wrote Linn, speaking more enthusiastically than before of the value of the claim, saying that it was from twelve to twenty feet wide, averaged one thousand dollars per ton, smelting process, assayed two thousand dollars per ton; to have no fears that their claim would be worth one hundred thousand dollars in less than one year, and inclosed a deed of Linn's location from Linn to himself, which he requested Linn to sign and forward as soon as

possible, urging as a reason that the local laws were very stringent, and he was fearful of not being able to hold the claim.

In due course of mail, French received the deed from Linn, together with a power of attorney and a letter. The deed and power of attorney were dated the ninth of February, 1871, and were preserved and produced at the trial. The letter accompanying them was not produced. French testified that it was his custom to burn all letters as soon as answered; that he had searched for this letter and could not find it, and that he supposed that it was burned; but defendants were not allowed to give evidence of its contents.

It was not contended by plaintiffs that there had been any failure to do sufficient work upon the Linn location to hold it, nor that, if the Linn location was ever good, it had been forfeited by any non-compliance with the laws or customs governing the district. What plaintiffs claimed was that the Linn location was void *ab initio*, in this, that either there was no sufficient authority in Moreland to make it, or if he had authority, that the location was a fraud upon the government, and therefore void. And now the foundation of plaintiffs' claim appears. One month after Moreland made the location for Linn of the first extension north of the Tiger lode, to wit, on the eleventh day of February, 1871, one Mary E. Sawyer went on the same premises and placed thereon a notice of location, claiming the same ground for herself.

She recorded her notice, did some work on the claim, and on the thirteenth of June following conveyed her claim in said premises to the plaintiffs. A short time after this purchase, plaintiffs put some men at work on the premises. Linn, one of the defendants, who had returned to Arizona about June 21, 1871, came with Moreland and another and prevented Davis and his men from working, and the latter parties then left the premises.

On the twenty-seventh of June, 1871, French, in whose name the title to the Linn location had been standing ever since the deed of Linn to him of February 9, 1841, deeded back one half of the ground to Linn for a nominal consideration of five hundred dollars as expressed in the deed, but no consideration in fact passed.

Linn testified that French retained half of the ground at his, Linn's, request, as security for Linn's indebtedness to him, which had been accruing at various times since 1866, and which he, Linn, believed amounted to about $1,000 at the time French deeded to him, June 27, 1871.

On July 18, 1872, plaintiffs brought suit in ejectment against defendants. Jury trial. Verdict for plaintiffs. Court set aside the verdict and ordered a new trial. Plaintiffs appealed from the order. The supreme court on appeal held that the verdict was properly set aside. The case went back and the trial was proceeded with. Verdict for plaintiffs. Motion for new trial denied. Defendants appeal from the judgment and order denying a new trial.

Appellants assign forty-five grounds of error, duly saved by a bill of exceptions. The first grounds of error assigned relate to the rulings of the court as to the cross-examination of plaintiffs' first witness, Mary E. Sawyer. Plaintiffs introduced Mary E. Sawyer, who testified that she went upon the premises in person, and placed her notice of location thereon, upon the eleventh of February, 1871; that she had the notice recorded, did some work, and conveyed her title to plaintiffs.

Defendants then asked the following questions:

1. Did you remove any notice, or notices, from the monument on which you placed your notice at the time you placed our notice there?

2. What did you find upon the monument at the time you placed your notice there?

3. Was the claim in controversy known as the Linn claim at the time and prior to the time you placed your notice on it?

4. Did you see any work done on the claim at the time ou made your location?

5. Was anybody else at work on the claim whilst you were at work there?

Defendants, under a general objection, were not allowed to ask any of these questions, and the refusal to allow these questions to be asked constitutes the first five grounds of error assigned by appellants.

Plaintiffs introduced John A. Rush, one of the plaintiffs, who testified that he and his co-plaintiff purchased the

premises in question from Mary E. Sawyer, about June 13, 1871; that on the day of the purchase, or day prior, he and his co-plaintiff went on the premises, with a view of purchasing; then purchased, and afterwards put men to work. Cross-examined: "When I went to examine the claim I saw that some considerable work had been done. I do not know by whom it was done."

6. Defendants were then prohibited from asking the following question, and assign such refusal as the sixth ground of error: "Were you not informed by your grantor that the work you saw on the claim had been made by Linn and French before your purchase?" Alonzo E. Davis, the other plaintiff, was then introduced by plaintiffs, and on direct examination testified to the same effect as Rush, as to visiting the premises prior to the purchase; that he put men to work, who were driven off by defendants; that no one was on the claim at the time his men went to work; that there was nothing to show that any one was in possession at the time; that the lands were considered public mineral lands at the time; and that he did not know of Mr. French's being in possession of the premises at the time. Cross-examined: "When I went with Mr. Rush to examine the ground, I saw a cut that had been run into the hill toward the lead."

7. Defendants were then prohibited from asking the following question: "Do you know by whom the work in the cut was done?" wherein they assign error 7.

8. Defendants were prohibited from asking, "Did you examine the district and county records before purchasing in regard to the adverse claim to Mary E. Sawyer, of Linn and French, to the premises in controversy?" Assigned as error 8.

9, 10. Defendants introduced William A. Linn, one of the defendants, who on direct examination testified as to his long friendship and intimacy with French, and as to the correspondence between him and French relative to the premises in question. Exceptions 9 and 10 were taken as to proving the contents of this correspondence, but are not pressed.

11. Defendants were prohibited from asking, "What authority, if any, did you ever give Mr. French to make location of mining claims for you in this territory, prior to the location of the Tiger mine?" wherein is assigned error 11.

Defendants introduced Washington French, one of the defendants, who, among other things, testified to his relations and correspondence with Linn. The letter of French to Linn, of January 27, 1871, asking Linn to send a deed of the ground, was produced. Witness was asked: "What did you receive in answer to this?" Answer: "I received a deed from Linn to two hundred feet of ground; also a power of attorney and a letter at the same time. I have not got that letter now. I suppose that it is burned up. I have searched for it, and can not find it. It was my custom, as I have stated, to burn all letters as soon as answered, and I suppose that this one was burned."

12. Defendants offered proof of the contents of this, as being instructions for the use of the deed and power of attorney accompanying it. Disallowed, wherein is assigned error 12.

13. Question by defendants: "For what purpose did you request Linn to send you a deed of the premises in controversy?" Disallowed. Assigned as error 13.

14. Question by defendants: "Did you have or claim any pecuniary interest in the ground in controversy by virtue of the deed from Linn to you?" Disallowed. Assigned as error 14.

15. Question by defendants: "Why did you have the deed and power of attorney both recorded?" Disallowed. Assigned as error 15.

16. Question by defendants: "Did you offer to reconvey to Linn the entire interest in the claim in controversy, on his return to Prescott?" Disallowed. Assigned as error 16.

William A. Linn, one of the defendants, recalled. Direct examination. Witness is shown the deed for the premises in question and the power of attorney from himself to French. He said that he executed them, and that there was no consideration from French for the deed.

17. Question by defendants: "For what purpose and what induced you to execute the deed and power of attorney to French of the claim in question?"

18. "Did you execute the deed to French at his request, as stated in his letter of January 27, 1871, and for the purpose therein mentioned?"

19. "For what purpose did you execute the deed to French, dated February 9, 1871?"

20. "For what purpose did you execute a power of attorney at the time you executed the deed of the claim in question?"

21. "Did you execute the deed for the reasons stated in the letter of January 27th?"

22. "What induced you to execute the deed of February 9, 1871, to French?"

23. "Did you expect to receive from French all the benefits derived from the claim deeded?"

24. "Did you at any time have any agreement or understanding with French by which you were to deed to French this ground or any portion of it for his own benefit?"

25. "Had you at any time before the location of this claim any agreement or understanding with French by which he was to cause locations of mining claims to be made for you and you to deed them to him, for his benefit?"

26. "Was the letter from French to you, dated January 27, 1871, the only inducement and consideration upon which you executed the deed to French, of February 9, 1871?"

All these questions, from 17 to 26, were objected to generally, and were disallowed, and therein are assigned errors 17 to 26 inclusive.

Defendants introduced E. S. Junior, who on direct examination testified that he knew all the parties to, and most of the circumstances of, this case; that he went himself on the premises for the purpose of relocating them a day or two before Mary E. Sawyer placed her location there; saw Linn's notice of location on the claim at that time; knew Mary E. Sawyer, plaintiffs' grantor; had a conversation with her as to her location of this claim about the time her location was made.

27. Question by defendants: "State what that conversation was."

28. "Did you have this conversation with Mary E. Sawyer on the same day that she placed her notice on the claim?"

29. Defendants offered to prove by this witness that at the time Mary E. Sawyer placed her notice on the claim in controversy, that she said that she relocated and jumped the claim, because Linn was a non-resident of the territory and

was not entitled to hold a claim. Questions 27, 28, and 29 objected to generally, and objection sustained; wherein appellants assign errors 27, 28, and 29.

Alonzo E. Davis, one of the plaintiffs, was called as a witness for the defense. On direct examination the first question was:

30. "Did you not, prior to the purchase by yourself and Rush of Mary E. Sawyer of the claim in controversy, examine the records in relation to the adverse claim of the Linn location?" General objection, and question disallowed. Assigned as error 30.

Witness then stated, in response to other questions, that he was not certain whether he stated on the former trial that he had examined the records prior to purchasing, but he knew in some way that the ground had been taken up for Linn and deeded to French, but that it was considered as a bogus claim.

31. "Did you buy the claim from Mary E. Sawyer because you supposed the conveyance from Linn to French was a bogus affair?" Disallowed. Assigned as error 31.

William C. Collier for defense. Direct examination.

"Have been engaged for ten years locating claims here. Am acquainted with the general custom of miners around here in making locations where no organization exists. My knowledge is confined to this county. Am not acquainted with them elsewhere."

32. Defendants asked: "State what are the general usages and customs of miners in making locations of mining claims in unorganized districts?" Disallowed under a general objection; and therein defendants assign error 32.

The record shows that the premises in question were situated in the county of which witness spoke.

Fred Henry for defense. Direct examination.

"My occupation has been that of mining and prospecting since 1858. I have prospected in what was then Utah, afterwards Nevada, from 1858 to 1861; since then, I have been in California, Idaho, Washington territory, New Mexico, and Arizona. I am acquainted with the usages and customs of miners in making locations in unorganized districts."

33. By defendants: "What is the general usage and

custom of miners in like places (unorganized districts) in regard to the discovery of mines in making locations for other parties not present?"    Disallowed; wherein defendants assign error 33.

34 and 35 are not pressed by appellants.

Counsel for defendants asked for the following instructions:

1. Plaintiffs must recover, if at all, on the strength of their own title; and having based their title on a location under and by virtue of the local rules and customs of the district, must not only show a compliance with these rules and customs, but that the claim was subject to location and appropriation at the time they, or those under whom they claim, sought to locate the same.    Given.

2. That if the claim or mining ground in controversy had been previously ("lawfully," inserted by the court) located and appropriated by defendants, and those from whom they derive their title, in accordance with the local rules or customs of the district or vicinity, plaintiffs can not recover by virtue of a subsequent location of the same claim or ground, unless they show a voluntary abandonment of the claim, or a failure on the part of the first locator to comply with the local rules or customs of the miners of the district. Given.    *And that such failure was of itself declared to be a forfeiture of the claim.*    Refused.

The counsel for defendants then and there excepted to the insertion of the word " lawfully " in the first clause of this instruction, and to the refusal of the court to give all of the above instruction; and assigned therein error 36.

3. That the right to locate and acquire title to the mineral lands belonging to the United States is not restricted to the inhabitants or residents of any particular district or portion of the country; and unless it is shown that the local rules and customs require the locator to be personally present to make the location, or to do some act in person, before acquiring a right to a mine or claim on a mine, all that is required to be done may be done by an agent or servant, for and in the name of his principal or employer, with the same force and effect as if done by the principal in person.    Given.

4. If the defendants were ("located and lawfully," inserted

by the court) .in the possession and occupancy of the claim in controversy at the time plaintiffs' grantor attempted to make her location, no right was acquired by such location. The court gave the above instruction after inserting the words "located and lawfully," to the insertion of which counsel for the defendants then and there excepted. Assigned as error 37.

5. To entitle plaintiffs to recover on the strength of possession alone, they must show an actual prior possession and occupancy without interruption for a sufficient length of time to show an appropriation to the exclusion of all the world; a mere scrambling possession, with occasional acts of ownership and control, is not sufficient. Given.

6. If the acts done by and under the direction of French for and in the name of Linn in the location and appropriation of the mines in controversy would, if done by Linn in person, constitute a good and valid title to the premises according to the local rules and customs of the mines and miners of the district, the subsequent ratification and occupation by Linn makes them his own acts, and invests him with all the rights which he would or could have acquired if he had been personally present and performed those acts in person. Given. *Unless a valid location by some other person had in the interval between the location of French and the ratification by Linn been made and perfected.* Added by the court.

The court gave the above instruction after adding the italicized clause at the end thereof—to which addition the counsel for defendants excepted then and there, and therein assign error 38.

7. No express or written authority is necessary to constitute an agent to make a location of a mining claim. Given. *And a location made by one person for and in the name of another vests a right in the one for whom the location is made, which can only be divested by his own acts or omissions or by operation of law.* Refused. The court added: "But some authority either express or implied must exist, or the agency must be ratified before other valid claims intervene." To the refusal of the court to give the instruction as asked, counsel for the defendants then and there excepted, and assigned error 39.

8. The law makes the discoverer of a mine the agent of those for whom he chooses to act, and his act becomes their act, regardless of the fact whether the party for whose benefit the location is made has any knowledge of it or not; in such cases, however, the agent making such location has no power afterwards to make any change in the same so as to affect injuriously the right of the party for whose benefit the location was made. A failure to comply with the local rules and customs of the district will not work a forfeiture, unless such failure is declared by such rules and customs to be a forfeiture. The court refused to give the above instruction, to which counsel for defendants excepted and assigned error 40.

9. It is not necessary that the record of a mining claim should be an exact copy of the notice placed upon the claim. If the record is substantially the same, describing the same ground by the same name, and of the same date, and substantially the same as the notice on the claim, it is a sufficient record.

Plaintiffs asked for the following instructions:

1. That if Moreland acted as the agent of Linn in locating the ground in controversy and located in the name of Linn, the defendants to avail themselves of such location must show that Moreland at the time of making such location had written authority from Linn to make such location. The court refused to give the above instruction, to which counsel for plaintiffs then and there excepted.

2. That the location of a mining claim upon the public mineral lands of the United States under the laws of the United States is the creation of an interest in lands within the purview of the statute of frauds, and an agent can not make such location for his principal, unless he be thereunto authorized by his principal, in writing. The court refused to give the above instruction, to which counsel for plaintiffs then and there excepted.

3. If the jury believe from the evidence that plaintiffs were in possession of the premises in dispute, and that defendants entered and ousted them therefrom, they will find for plaintiffs, unless the jury believe from the evidence that defendants had a better right to the premises than the plaintiffs. Given. Assigned as error 41.

4. If the jury believe that French had authority to act as the agent of Linn in locating the ground in controversy, that authority could not be delegated by French to any other person without express authority from Linn to do so. The court refused to give the above instruction, to which counsel for plaintiffs then and there excepted.

5. If Moreland had the authority to make the location in question, defendants, in order to avail themselves of it, must show that the location was made in accordance with the local rules and regulations of miners in the mining district in which the said location was made, and that the notice of location was transmitted to the county recorder within sixty days after the location was made. The court refused to give the above instruction, to which counsel for plaintiffs then and there excepted.

6. If the location of the mining claim in question was made in the name of Linn by Moreland and French, or either of them, for the purpose of having Linn convey to them, or either of them, the whole or any part of said mining claim without further consideration, Moreland and French having already located two hundred feet each on the same lode, and Linn ratified the act of location for the purpose of making such conveyance, such location was void, as made in fraud and evasion of law. Given. Assigned as error 42.

7. That if the jury believe from the evidence that Linn and French were partners, and that French located the ground in controversy in the name of, and for the individual use of, Linn, and not for Linn and French, then the partnership conferred no authority upon French to locate for Linn. The court refused to give the above instruction, to which counsel for plaintiffs then and there excepted.

8. That no person can make more than one location upon the same lead or lode. The court refused to give the above instruction, to which counsel for plaintiffs then and there excepted.

9. A person having made for himself, or other person or persons, a location for mining purposes on a quartz lead or lode, can not afterwards make either for himself or any other person, another location on the same lead or lode.

The court refused to give the above instruction, to which counsel for plaintiffs then and there excepted.

The court also gave to the jury the following instructions:

1. A party locating a mining claim upon the public lands of the United States, and complying with the laws of the United States and with the local rules and customs of miners in the mining district in which the claim is situated, in locating and holding such claim, acquires a right to the possession of such claim against every one except those who have legally appropriated such claim prior to such location.

2. If the location of the mining claim in question was made in the name of Linn by Moreland and French, or either of them, for the purpose of having Linn convey to them, or either of them, the whole or any part of the said mining claim, without further consideration, Moreland and French having already located two hundred feet each upon the same lode, then the location was absolutely void, and made in fraud and evasion of law.    To the above, counsel for defendants then and there excepted.

3. A *bona fide* possession of the premises by plaintiffs, of however short duration, prior to an ouster by defendants, will entitle plaintiffs to recover, unless defendants show a better right to possession than that of the plaintiffs.    To the above, the counsel for defendants then and there excepted, and assigned as error 43 the giving of said second and third instructions.

44. That it was error to refuse a new trial in this: that the evidence is insufficient to justify the verdict.

45. That it was error to refuse a new trial in this: that the verdict is against the law as given to the jury by the court.

In approaching the consideration of this case, we find a multitude of objections to evidence certified from the court below, and we deem it well to call attention to some general rules on the subject.   In doing so, we do not mean to reflect on the practice of attorneys in this particular case; on the contrary, we feel more like complimenting the counsel on both sides for the extraordinary care bestowed on the case, and for the very able briefs filed, which have rendered the

examination of the questions raised more a pleasure for the court than a task. But it is astonishing how many appeals are lost through a defect in the transcript as to the presentation of the grounds of objection to evidence. Case after case occurs in every state where the whole benefit of an objection is lost by an imperfect record on the matter of exceptions to evidence. The mere exception itself is generally taken correctly, and we think, as a matter of fact, that the proper grounds of objection are generally stated on the trial and strenuously urged, but when the record comes to the supreme court the transcript fails, with wonderful frequency, to show what grounds of objection were urged; and the benefit of the exception is lost.

This, doubtless, arises in a great measure from the absence of phonograpic reporters, and the disinclination of all parties to stop in the midst of a trial, and keep a judge and jury waiting, in order that counsel may clearly settle their exceptions. We know that it is very hard to do this in the absence of short-hand writers, but until a more enlightened public opinion furnishes us with these wonderful aids to the dispatch of business, we must plod on in the old cumbrous way and let juries possess their souls in patience, as best they may.

We hope the consideration we have given this subject, and the references we have made to adjudications on the point, will enable the bar of this territory to avoid many difficulties of this kind in the future.

The cases where we are called on to review rulings on the admission of evidence may be reduced to two classes: 1. When the party objecting was overruled and he appeals. 2. When the party objecting was sustained and the other side appeals.

In the first case, where the party objecting was overruled and he appeals, he must show by the record: 1. What the question was, and what answer was given to it, or what the evidence was which was introduced against his objection.

This is important, because the evidence admitted may not injure him. The answer may have been in his favor. It is not necessary that he should show clearly that he was injured, because that would often be impossible, but he

must show that the evidence was admitted against his valid objection, which, it may be, has injured him; for the object of granting a review by this court is not to determine the abst·act questions as to whether the judge below ruled correct'y or not, but to give relief in case a party may have been injured by an erroneous ruling.

2. He must set out enough of the evidence to illustrate the point of his objection, and to raise the presumption that he may have been injured, but where error is shown, injury will be presumed, unless the contrary clearly appears.

3. He must show what kind of an objection was made, and to avail him here he must show that the objection as made was good. Then it is for the other party to see that the statement made contains a showing sufficient to sustain the admission of the evidence as against the objection made. The amount of showing the latter party must make depends upon the nature of the objection. If the party objecting interpose merely a general objection, all that is necessary is to show enough to obviate the general objection. If the objection is specific, all that is necessary is to show enough to obviate the specific objection as made. Beyond this, we can not in reason require him to go. He should defend himself against the particular attack made, but we can not ask him to fortify himself against all possible attacks which might have been made. In the second case, where the party objecting was sustained, and the other side appeals and asks to have the ruling declared erroneous, the party appealing must see that the record shows: 1. What question he asked or what evidence he sought to introduce; 2. Sufficient of the other evidence to illustrate the admissibility of that offered; 3. That the evidence so offered was excluded; 4. That there is reasonable ground to presume that he may have been injured by such exclusion. The other party must see that the record shows good grounds of exclusion.

WHAT GROUNDS OF OBJECTION WILL BE CONSIDERED ON APPEAL.

The supreme court, in examining a question as to whether a ruling of the court below on an objection to evidence was correct or not, will not consider any other grounds of objection to the evidence than those urged in the court below. This rule is of universal adoption in the courts of this country. We do not see that it makes any difference which

party it is that complains of the ruling, the question not being one of parties, but simply whether the ruling was correct or not. Of course no one can complain of the ruling unless he appeals. *Martin* v. *Travers*, 12 Cal. 245, and numerous cases there cited; *People* v. *Glenn*, 10 Id. 32, and cases hereinafter cited under the question as to what is the effect of a general objection.

The reason of the rule is apparent. Courts are instituted and judicial proceedings are granted for the purpose of securing speedy justice. The right of parties to be protected against improper evidence is mutual, and is secured in the most ample manner. All that is required is that the party complaining state a proper objection, and if the judge below refuse to exclude, when the proper objection is made, or exclude when the objection made is not proper, relief is granted here on review. But a party wishing the benefit of the remedy must, at the time he complains, show how he is hurt; in the language of the old authorities, he must lay his finger upon the point of objection. 2 Bac. Abr. 529; see also *Martin* v. *Travers*, 12 Cal. 245; *Frier* v. *Johnson*, 8 Johns. 496; *Jackson* v. *Cadwell*, 1 Cow. 622; *Whiteside* v. *Jackson*, 1 Wend. 418; *Waters* v. *Gilbert*, 2 Cush. 29; *Covillaud* v. *Tanner*, 7 Cal. 38.

He must not merely complain in a general way, and say that to let certain evidence in will hurt his case, and that under the law it ought to be excluded, and leave the judge and opposite side in the dark as to what principle of law he relies on, and compel them to decide hap-hazard, or else stop the trial of the cause, with a jury waiting, while the counsel examine the whole body of the law, from the earliest judicial expositions down to the latest act of the legislature, to see if they can discover any valid objection to the testimony. The opposing counsel can make no reply to a general objection, except to throw the whole responsibility upon the judge at once, or else begin systematically and argue that under any possible objection the testimony should come in. Many trials under such a system would practically never end. The effect of it would be to compel one to fight in the dark, not knowing when his opponent strike, while the other would be free to choose d the time and place to use them. Such

things may do in love or war, when all things are said to be fair; but life is too short to transact business on such a system in courts of justice.

It may be urged that where a judge below has ruled on an objection, we should uphold his ruling, if any reason can be found to sustain it, even though it be a different one from that assigned, as in the case of a judgment. It is true that we must do so when the ruling is correct, but the very question raised by the exception is whether the ruling is correct or not. We are driven at once to the question, Did the party objecting state at the time good grounds of objection? If he did, of course his objection must prevail; if he did not, of course it must fall.

### WHY GROUNDS OF OBJECTION SHOULD BE STATED.

The object of requiring the grounds of objection to be stated, which may seem to be a technicality, is really to avoid technicalities and prevent delay in the administration of justice. When evidence is offered to which there is some objection, substantial justice requires that the objection be specified, so that the party offering the evidence can remove it, if possible, and let the case be tried on its merits. If it is objected that the question is leading, the form may be changed; if that the evidence is irrelevant, the relevancy may be shown; if that it is incompetent, the incompetency may be removed; if that it is immaterial, its materality may be established; if to the order of introduction, it may be withdrawn and offered at another time—and thus appeals could often be saved, delays avoided, and substantial justice administered.

Counsel are held to the grounds of objection stated at the time they call for a decision of the judge below; because they are supposed to know the law of their case, and if they do not offer other objections they are supposed to waive them, and evidence admitted without valid objection should stand. Counsel must not be permitted to wink at the introduction of evidence to which they think there is a valid objection, hoping that it may benefit them, and if it goes the other way, move to exclude it; neither must they be permitted to plead inattention as an excuse. It is their ness to be attentive on a trial, and if they m

neglect, they must lose it. Neither can we allow then
strike between wind and water on the trial, and then go hom
to their books and study out other objections and urge them
here. They must stand or fall upon the case they made
below, for this court is not a forum to discuss new points of
this character, but simply a court of review to determine
whether the rulings of the court below on the case as pre-
sented were correct or not.

### EFFECT OF A GENERAL OBJECTION.

A general objection is unworthy of consideration. This
is stating the rule very broadly, but perhaps the only limita-
tion it can ever require is in those exceedingly rare cases
where it is apparent on the face of the proposition that it
is impossible the evidence is or can be made available for
any purpose. As the object of requiring a specific objec-
tion is to enable the other party to obviate it if possible, if
the objection is apparent, and it is clear that the defect can
not possibly be obviated, a specific objection would not
help the adverse party, and in such case a general objection
would be sufficient. But of course such cases will be very
rare, and a prudent practitioner will hardly risk any point on
a general objection. *People* v. *Apple,* 7 Cal. 290; *Kiler*
v. *Kimbal,* 10 Id. 267; *Martin* v. *Travers,* 12 Id. 245; *Baker*
v. *Joseph,* 16 Id. 180; *Mabbett* v. *White,* 12 N. Y. 451; *Kansas
P. R. R.* v. *Pointer,* 9 Kan. 629; *Wilson* v. *Fuller,* Id. 186;
*Walker* v. *Armstrong,* 2 Id. 226; *Jackson* v. *Cadwell,* 1 Cow.
639; *Michel* v. *Ware,* 3 Neb. 235; *Johnson* v. *Adleman,* 35 Ill.
265; *Carroll* v. *City of Benicia,* 40 Cal. 390; *Rosenheim* v. *Am.
Ins. Co.,* 33 Mo. 230; *Greene* v. *Gallagher,* 35 Id. 226; *Clark*
v. *Conway,* 23 Id. 438; *Grimm* v. *Gamache,* 25 Id. 41; *Stone*
v. *Great Western Oil Co.,* 41 Ill. 85; *Graham* v. *Anderson,* 42
Id. 514; *Howell* v. *Edmonds,* 47 Id. 79; *Moser* v. *Kreigh,* 49
Id. 84; *Hanford* v. *Obrecht,* Id. 146; *Harmon* v. *Thornton,* 2
Scam. 351; *Gillespie* v. *Smith,* 29 Ill. 473; *Sargeant* v. *Kellogg,*
5 Gilm. 273; *Swift* v. *Whitney,* 20 Ill. 144; *Buntain* v. *Baily,*
27 Id. 410; *Johnson* v. *Adleman,* 35 Id. 265; *Tozer* v. *Hershey,*
15 Minn. 261; *Weide* v. *Davidson,* Id. 330; *Schell* v. *National
Bank,* 14 Id. 47; *Gilbert* v. *Thompson,* Id. 544; *Bickham* v.
*Smith,* 62 Pa. St. 45; *Batdorff* v. *Bank of Reading,* 61 Id. 179;
*Moore* v. *Bank of Metropolis,* 13 Pet. 302; *Elliott* v. *Peirsol,* 1

328; *Camden* v. *Doremus*, 3 How. 515, 530; *Hinde* v. *ongworth*, 11 Wheat. 199.

### EFFECT OF SPECIAL OBJECTION.

An objection that the testimony is irrelevant without specifying wherein or how or why it is irrelevant will not be considered in the supreme court as raising any issue, if the testimoney could, under any possible circumstances, have been relevant. *Dreux* v. *Domec*, 18 Cal. 83. An objection that the testimony is inadmissible may be disregarded. It amounts to no more than the assertion that the evidence is illegal. The objection should fully and specifically point out how it is inadmissible. *Leet* v. *Wilson*, 24 Id. 402. When an objection is that the evidence offered is incompetent and illegal, it is the duty of the court to overrule it if the evidence was admissible for any purpose. *Sneed* v. *Osborn*, 25 Id. 627; *Bohanan* v. *Hans*, 26 Tex. 450. An objection that evidence is incompetent does not raise any issue as to whether the question is leading or not. The only way to raise such an issue is to object specifically that the question is leading. *Kansas R. R.* v. *Pointer*, 9 Kan. 627. Where a witness was clearly incompetent by express statute as to certain conversations by reason of the death of a party, an objection to the evidence as irrelevant, immaterial, or improper was held not sufficient. There must be a specific objection that the party is not a competent witness, because the person with whom he transacted the business, and about whose statement he proposes to testify, is dead. *Cornell* v. *Barnes*, 26 Wis. 480, June term, 1870.

This case is somewhat interesting, from the fact that the court, while adhering to the law, expressed its personal regret that the proper objection had not been made, the party deceased having been so well and favorably known to the court that it would not believe the charges made against him, even though the evidence had been properly admitted. The objection was that the evidence was immaterial, irrelevant, and improper. But it was very relevant, very material, and very proper if it were competent. But the question of its competency was not raised, and therefore it was error to exclude it.

An objection to a deposition for substance raises no ques-

tion as to competency, but the party objecting subsequently raised the point of competency, just as the judge was going to charge the jury, asking to have the evidence excluded for incompetency. Refused, and refusal upheld. On appeal, the court said it would be unjust to the plaintiff to allow the defendant, after the testimony is closed and the court ready to charge the jury, to raise the question of competency when he had placed his objections upon some other grounds at the time the testimony was introduced. If the defendant had objected for incompetency at the time, the plaintiff might have availed himself of other testimony on the points. *Motley* v. *Head*, 43 Vt. 636.

An objection was made that certain evidence was incompetent. The judge refused to entertain the objection unless accompanied by a specification of grounds upon which the party objecting claimed that the evidence was incompetent. Exception to such ruling. On appeal, the supreme court declared: "We think the judge very properly refused to entertain the objection. A judge presiding at the trial of a cause is not to be burdened with the duty of searching for objections to an inquiry put by counsel which the opposing counsel is himself unable to discover, or which, if apparent to his own mind, he sees fit to conceal for no other purpose apparently, than to prevent a full consideration of the objection, and with the ultimate intent of taking advantage of an error, in case of defeat, which might have been avoided if his views of the matter had been fairly and candidly expressed at the proper time." *Bundy* v. *Hyde*, 50 N. H. 121, July term, 1870.

An objection that evidence was irrelevant, incompetent, and immaterial was held to be merely a general objection, and not good if the evidence was admissible for any purpose. *Voorman* v. *Voight*, 46 Cal. 397.

There are numerous authorities and adjudications in support of the natural common-sense proposition that a general objection raises no issue, except as to whether the evidence would under any circumstances or for any purpose be admitted; and that a special objection raises no other issue than the particular one tendered. They are also in support of the proposition, that if a judge overrule a general objection, he must do so if valid, unless it clearly appears

that under no possible circumstances in the case could the evidence come in; and that if he sustain a general objection, he must be reversed if it is possible that under any view of the case the evidence might be admitted. That if he over-rule a special objection, he must be sustained if the partic-ular objection is bad, no matter how many other good objections might have been offered; but if he sustain a special objection, he must be reversed if the special objec-tion urged is not good, notwithstanding that there may be other objections, which, had they been urged, would have sustained his rulings. The policy of the law is, evidently, to admit evidence unless a good objection to it is clearly shown.

All the equities and all the presumptions are, not that a ruling is correct, but that evidence offered ought to come in, unless at the time it is offered good reason is shown why it should be excluded. "Competency is presumed until the contrary is shown." *Hall* v. *Gittings*, 2 Harr. & J. 112, 120, 121, and the cases cited by Chase, C. J., at the last page; *Stoddert* v. *Manning*, 2 Harr. & G. 147; *Callis* v. *Tolson*, 6 Gill & J. 80, 91; *Saxon* v. *Boyce*, 1 Bail. 66; *Smith* v. *White*, 5 Dana, 382, 383.

### LIMITS OF CROSS-EXAMINATION.

The first five assignments of error may be considered to-gether, they being all based on the refusal of the court to allow defendants to cross-examine plaintiffs' witness as to what she saw and did with regard to an alleged former loca-tion, at the time she claimed to have made a mining location on the same premises. The witness testified in chief that she went upon the ground, put up a notice, and did some work. On being cross-examined, she said she did not erect any monument, but put her notice on a stone monument al-ready there, by lifting a rock, placing her notice under it, and then replacing the rock. She was then asked by defend-ants whether she removed any notice from the monument at the time; what she found on the monument at the time; whether the premises were not known as the Linn claim at the time; whether she saw any work done on the claim at the time; and whether anybody else was at work on the claim while she was at work there. General objections to all these

questions were sustained by the court. Respondents argue that defendants could not cross-examine as to these matters; that it was opening defendants' case, and that testimony to open their case could not be so introduced. But while respondents make this argument here, it does not appear from the record on what grounds they urged their objection below. No grounds are stated in support of any objection made by either party at any time in the trial below.

ENGLISH RULE.

The English rule on cross-examination is, that when a witness has been introduced and sworn and examined as to any material point in the case, the other party may cross-examine him as to the whole case, including any new matter of defense; but the extent to which he may be allowed to press the witness with leading questions will depend upon the circumstances of the case, the demeanor of the witness—his apparent bias and other things—and must, to a great extent, be left to the discretion of the judge. 2 Ph. Ev. 896–911. This rule is followed to a great extent in the United States. Parties may cross-examine as to all matters pertinent to the issue. *Webster* v. *Lee,* 5 Mass. 335, June term, 1809. Where a witness is sworn generally in a suit he can not be restricted on cross-examination to such points as the party calling him may choose to select. *Merrill* v. *Berkshire,* 11 Pick. 274.

Chief Justice Shaw of Massachusetts reviews the question thus: "But upon the question whether as a general rule the cross-examining party is prohibited from putting a leading question to a matter not inquired of by the party calling him on his examination in chief, there is adversity of opinion. It was held by Mr. Justice Washington that such questions could not be put. *Harrison* v. *Rowan,* 3 Wash. C. C. 580. This is a very respectable authority and entitled to great consideration. But in the case cited, the nature of the question and the circumstances under which it was put are not stated, and no argument was had, and no authority cited. The same view seems to have been taken by the supreme court of Pennsylvania. *Ellmaker* v. *Buckley,* 16 Serg. & R. 77. But we think the general practice has been otherwise, both in England and in this state, and is so laid down by the

compilers. 1 Stark. Ev., 4th Am. ed., 131; 1 Phil. Ev. 6th ed., 260. There is one authority directly in point where the objection was taken, and it was decided by Lord Kenyon, at *nisi prius*, that such leading question is admissible: *Dickinson* v. *Shee*, 4 Esp. Cas. 67; so in several recent cases it has been held, that where a witness is called to a particular fact, he is a witness to all purposes and may be fully cross-examined to the whole case, and no distinction is suggested as to the mode of cross-examination. *Morgan* v. *Brydges*, 2 Stark. 314; *Rex* v. *Brooke*, Id. 472. On the whole, the court are of opinion that the weight of authority is in favor of the right to put leading questions under the circumstances stated, and that this is confirmed by practice and experience. It is most desirable that rules of general practice, of so much importance and of such frequent recurrence, should be as few, simple, and practical as possible, and that the distinctions should not be multiplied without good cause.

" It would be often difficult in long and complicated examinations to decide whether a question applies wholly to new matter, or to matter already examined into in chief.

" The general rule admitted on all hands is, that on a cross-examination leading questions may be put, and the court are of opinion that it would not be useful to ingraft upon it a distinction not in general necessary to attain the purposes of justice in the investigation of the truth of facts; that it would often be difficult of application, and that all the practical good expected from it may be as effectually attained by the exercise of the discrectionary powers of the court where the circumstances are such as to require its interposition." *Moody* v. *Rowell*, 17 Pick. 498; S. C., 28 Am. Dec. 317.

It should be borne in mind that the point involved in the case from 3 Wash. C. C., quoted by Chief Justice Shaw, was not whether the witness might or might not be cross-examined as to new matter, but whether on that cross-examination leading questions as to such new matter might be put. There is a general impression that the right to cross-examine implies the right to put leading questions, but the very point of *Harrison* v. *Rowan*, 3 Wash., is that the judge there was of the opinion that such is not always the case

that you may cross-examine and lead while you keep within the limits of plaintiff's case; but that when you strike new matter, though you may still cross-examine, you must not in that part of the cross-examination put leading questions: and though this seems a fine distinction, it may often be broad enough to secure valuable results.

But in Massachusetts and many other states they reject even this limitation on the English rule, and hold that leading questions may be put in cross-examination as to all matters in issue in a case.    It may be urged that great hardship to a plaintiff might arise under so broad a rule, that he would never be safe in calling any witness, unless he knew, to an absolute certainty, how he would stand the fire of cross-examination all along the line of the case; but after an experience of fifty years under this rule in Massachusetts, the court say, in the October term, 1854: "Experience has shown that this rule is convenient and easy of application in practice, and works no disadvantage to the party producing a witness.  On the other hand, a different rule, by making it necessary for the court during the examination of a witness, constantly to determine what is or is not new matter, upon which the opposite party has a right to put leading questions, leads to confusion and delay in the progress of trials."    *Beal* v. *Nichols,* 2 Gray, 264.

The English rule is followed in New York:  *Jackson* v. *Varick,* 7 Cow. 238; *Varick* v. *Jackson,* 2 Wend. 167; S. C., 19 Am. Dec. 571; *Fulton Bank* v. *Staffo d,* 2 Wend. 483.

It prevails in Vermont: *Linsley* v. *Lovely,* 26 Vt. 123; in Ohio: *Legg* v. *Drake,* 1 Ohio St. 286; in Missouri: *Page* v. *Kankey,* 6 Mo. 433; *Brown* v. *Burrus,* 8 Id. 26; *St. Louis and Iron Mountain R. R. Co.* v. *Silver,* 56 Id. 265; also in Wisconsin: *Knapp* v. *Schneider,* 24 Wis. 70.

To what extent it prevails in other states we are unable to say, on account of the limited number of reports accessible to us here.

### AMERICAN RULE.

Greenleaf says, vol. 1, sec. 445, that some of the states have adopted a contrary rule, which is called, by way of distinction, the American rule, but refers to only two cases, *Harrison* v. *Rowan,* 3 Wash. C. C. 580, and *Ellmaker* v.

*Buckley,* 16 Serg. & R. 77. But 3 Wash. C. C. is not a state report, and it does not say that the cross-examination shall not be had, but simply that leading questions shall not be put on such cross-examination as to new matter; and *Ell-maker* v. *Buckley* does not say it shall not be done, but simply that it may be refused as a matter in the discretion of the judge. Greenleaf, 1 Ev. 447, says that though the party may not cross-examine as to new matter before opening his case, he may recall the witness and cross-examine him after he has opened. In the same section, 447, he says that the rule is considered well settled, by the supreme court of the United States, that a party has no right to cross-examine except as to facts and circumstances connected with the matters stated in his direct examination, and quotes *Philadelphia & T. R. R.* v. *Stimpson,* 14 Pet. 448. We can not comprehend how this matter could have been considered by the supreme court as well settled. It certainly had not been settled by the supreme court itself. The point had never been before the court and was not before it in 14 Peters. The question before the court was as to the admissibility of certain evidence which was excluded below. The record showed that it was offered for the purpose of proving that the Baltimore Railroad Company, in making a compromise with a certain patentee and paying him an agreed sum to settle a claim he made upon them for an infringement of his patent, did not recognize that the patentee's claim was good, or that he had any right in the invention, but that the money was given to him simply to get rid of him. The supreme court said that on this showing the court below was right in excluding the evidence; that it was immaterial, or inconsequential, as they say; that the reasons which induced the Baltimore Railroad Company to pay money to the patentee have nothing to do with the patentee's right to his invention.

Then, after disposing of the question as presented by the record, they go a little further for the purpose of satisfying counsel, and say: "But it is now said that evidence was in fact offered for the purpose of rebutting or explaining certain statements made by one of defendant's witnesses in answer to cross-examination made by plaintiff's counsel." Then the court replies:

1. It does not seem natural from the record that the evi-

dence could have been offered simply to rebut those statements.

2. Defendant might have objected to the admission of those statements as not being legitimate under the cross-examination, they not being statements of facts and circumstances connected with the matters stated in his direct examination.

3. The question is then presented whether defendant, having omitted to object to improper evidence brought out on cross-examination, can thereby found a right to introduce testimony in chief to rebut or explain it.

This is the question to which all this introducing matter leads up, but they do not decide the question, and therefore it can not be said that having decided a question wherein the other proposition was taken as a necessary premise, they, by implication, decided that also. They dismiss the question with the remark, that if this improper cross-examination by the plaintiff had brought out something to his disadvantage, he would not have been allowed to rebut it, and therefore there is great difficulty in saying that if he could not do so defendant might; and then they waive the question altogether, and say that they place their ruling sustaining the exclusion of the evidence on other grounds, viz.: that it was not distinctly stated below that it was offered in rebuttal, and that it was seeking to introduce parol evidence as to a matter evidenced by a written instrument, without producing or accounting for the instrument.

Now is it not apparent from this that the second declaration on which it is claimed that so important a principle as the American rule on cross-examination is founded, is a mere *dictum* occurring in the statement of matters of inducement made for the purpose of bringing another question into notice, which other question was finally dismissed without adjudication? We apprehend that no court holds itself responsible, or desires to be held responsible, for every incidental remark made for the purpose of illustrating a question under consideration. We can not know what the court meant by saying that the principle involved in the second declaration was well settled. They could not have meant well settled in England, for such had never been the rule there. Nor in Massachusetts, Vermont, New York, Ohio,

Wisconsin, or Missouri. The case they had in hand was from Pennsylvania, and the rule in that state was, it is true, settled, as the supreme court says; but whether they meant that, or that it was settled in the United States circuit court for Pennsylvania, or what they meant, we can not tell. A *dictum* is defined by Bouvier to be "an opinion expressed by a court, but which, not being necessarily involved in the case, lacks the force of an adjudication." It frequently happens that in assigning its opinion upon a question before it, the court discusses collateral questions, and expresses a decided opinion upon them. Such opinions, however, are frequently given without much reflection and without previous argument at the bar, and as, moreover, they do not enter into the adjudication of the point before the court, they have only that authority which may be accorded to the opinion, more or less deliberate, of the individual judge who announces it. 1 Bouv. 476.

This dictum in 14 Peters may have contributed somewhat to the declaration in *Houghton* v. *Jones*, 1 Wall. 705, which still further contracts the rule. But even the rule as stated in 14 Peters is very broad; it covers an inquiry into all the facts and circumstances *connected* with the *matter* stated in the direct examination; but while it is broad, it is also uncertain, and uncertainty is almost the greatest defect a rule can have. Whatever may be urged against the English rule, it can not be charged with uncertainty. It possesses certainty even to my Lord Coke's celebrated third degree. There is little danger of trenching upon its limitations, for it is practically without any. We do not wonder that it is popular with judges, for it relieves them of all anxiety upon one of the most intricate and delicate branches of their duty. But it seems very hard that a party may be allowed to set up new matter in defense and draw the proof to support it out of the plaintiff's witnesses by cross-examination. Doubtless it is the apprehended hardship of this part of the rule which has tempted courts to depart from it; but whenever they have done so, and have failed to adopt some other definite rule, great trouble and difficulty have followed. The matter is one of the greatest possible moment. It affects, or may affect, the examination of every witness in the opening of every case; and it is a question which the

*nisi prius* judge must pass upon at once when presented.    It is of the greatest importance to suitors, judges, juries, and counsel that some clear, well-settled rule be adopted, which may be applied with some reasonable celerity and certainty. In California they have cut loose from the old rule, and the consequence is, that such renowned jurists as Baldwin and Sanderson confess, that even on appeal, with full time for examination, they have difficulty in coming to a satisfactory conclusion as to what the judge below should have admitted and what he should have excluded.    Under such a condition of things, no matter what the ruling of the judge below may be, there is always a fair chance for an appeal.    It is a reproach to the law to admit that such an imputation is just. Rather than have such a state of things obtain here, we would be in favor of adopting the English rule out and out, for that at least has certainty to commend it.    Judges in this country, who have worked under it, say it entails no hardship.

The first case in California where this question arose was in 1855.    A majority of the court claimed to follow the case in 14 Peters and excluded the question; but Heydenfeldt, J., dissented, and stated that he thought the English rule ought to be adopted.    *Landsberger* v. *Gorham*, 5 Cal. 451. In 14 Cal., four years later, Judge Baldwin speaks of difficulty under the construction adopted in California.    He finally says that the question proposed was proper, but the only definite reason he gives for its propriety is that it did not concern new matter of defense, but was simply in denial of plaintiff's case.    He comments on Greenleaf's rule, but does not touch the point whether defendant might not subsequently call the witness and cross-examine even on new matter.    *Jackson* v. *Feather R. W. Co.*, 14 Cal. 24.

The next time we find the point appearing in California is in 1864, when it was held that "the witness not having testified in chief upon the subject of the alleged breach, defendant had, in strictness, no right to interrogate the witness upon that subject at that time."    Shafter, J., in *Aitken* v. *Mendenhall*, 25 Cal. 213.    The qualifying words "at that time" might seem to point to that portion of the rule in Greenleaf which says that defendant may cross-examine the witness by recalling him after his case has been opened,

We next find the question raised in *Wetherbee* v. *Dunn*, 32 Cal. 106, in 1867. Defendants offered testimony by cross-examining one of plaintiffs' witnesses, which, though relevant, did not tend to rebut anything which that witness had said in his direct examination. Held, that "it was properly excluded upon the objection of plaintiffs as to that mode of proof. So far as we can learn from the transcript the offer was not subsequently renewed." Sanderson, J. By the concluding sentence, it would seem that the court had also in mind the provision in Greenleaf as to cross-examination on recall. The question come up again in 33 Cal., in the same year as the last case. Judge Sanderson acknowledges having difficulty with the point. The plaintiff sued for an accounting of a partnership, concerning a mining company, in which there were shares of stock. Defendant asked one of plaintiff's witnesses on cross-examination whether the plaintiff had not assigned to him twenty-five shares of stock, which it was not contended was not the property of plaintiff to dispose of as he pleased. The object of the question was evidently to throw some discredit upon the witness, as showing him to be biased in favor of plaintiff. He says that the court erred in prohibiting the cross-examination, but the only reason he gives is that the witness was intimately associated with the plaintiff in matters directly connected with the facts involved in the action, and spoke to the main points in issue; that, under the circumstances, the defendant had a right to test his credibility by any mode of examination that was calculated to illustrate the attitude and relation of the witness to the parties and the subject-matter of the action. *Harper* v. *Lamping*, 33 Cal. 647.

But the question is, Under what general principle of law was it proper to exclude this question? How is a party to bring himself under the rule of this case? How is he to know what may reasonably be held to be within the rule in Harper's case? That the decision did not settle the point, we may infer from the fact that it was very soon after again presented to the court. We find it in *Thornton* v. *Hook*, 36 Cal. 223, in 1868. Plaintiff sued a sheriff for attaching and taking from him a team of horses. In presenting his case he proved by a witness that he had placed the horses in possession of witness to keep them for him on witness's farm, and

that while witness was so keeping them for him the sheriff attached and took them in a suit brought by creditors against one Bogart.

Defendant on cross-examination asked the witness if he knew how plaintiff came into possession of the horses, and if he knew whether, before the property was put into his possession by plaintiff, it had ever belonged to Bogart. Excluded. On appeal the court began by declaring: "It is not always easy to, determine the precise point beyond which a cross-examination should not be allowed to proceed."

They say in effect that this question touched the destruction of plaintiff's case, but it also tended to help defendant's case; that it was pertinent to the matter pending, but that it also affected new matter. Then they say they will declare no rule in such a case, but leave it to the discretion of the judge below, and cite *Ellmaker* v. *Buckley*, and 7 Cushing, as authority for so doing. But the case in 7 Cushing, *Burke* v. *Miller*, 550, is a Massachusetts case, where the English rule prevails, and the right to a full cross-examination was admitted, the only objection made being that the judge ordered the defendant to wait till he had opened his case, there being no denial to him of his right, but merely a ruling on the order of testimony, it was held to be discretionary with the judge.

But the supreme court of Nevada meet this issue squarely on this point of double pertinency, and say that in such a case " the fact that circumstances called forth by legitimate cross-examination happen also to sustain a cross-action or counter-claim affords no reason why they should be excluded." *Ferguson* v. *Rutherford*, 7 Nev. 391. And in support of such proposition they cite 8 Mee. & W. 858. This seems to us the more reasonable doctrine, first, because there is certainty in it, and second, because it seems unfair that a question legitimate to bring out some truth which will help the defendant may be suppressed, because it must necessarily bring out other evidence, which in strictness ought to be offered at another time and possibly in another form.

Illinois is also vague and indefinite as to just what the new rule, called the American rule, means. In fact, no two authorities that we can find agree as to what the rule is.

The United States supreme court, in 14 Peters, does not follow Greenleaf; the 1st Wallace does not follow 14th Peters; and the state courts follow none of them, but seem to decide each case on its own inherent equities. The first glimmer of light, in the matter of precedent, which we can see upon the subject of how to proceed, if the English rule is departed from, is from Judge Baldwin, in the case of *Jackson* v. *Feather R. W. Co.*, in 14 Cal. He decides the matter first upon the general equities, and then adds that there is another reason why the evidence was proper, viz., that it did not relate to new matter of defense, but was a mere denial of plaintiff's case.

Judge Garber of Nevada, in *Ferguson* v. *Rutherford*, 7 Nev. 390, takes up the idea shadowed forth by Baldwin, and evolves from it a clear, definite rule, which everybody can understand, and which any one thoroughly versed in the effect of pleadings can apply, viz., that the one invariable test to determine whether the cross-examination can be permitted is, Does it concern new matter of defense or not? As we understand the purport of this decision, it means that whatever is in mere denial of plaintiff's case may be brought out on cross-examination, whether the witness directly testified concerning it or not; that any such matter is, for this purpose, a fact or circumstance, legitimately connected with the matter testified to; if the witness has testified to any material fact in behalf of plaintiff's case, he may be compelled to disclose on cross-examination all he knows about the plaintiff's case, and everything that will go towards denying and destroying the case set up by plaintiff; that so far as defendant has a right to cross-examine on such matter, he shall have the full benefit of cross-examination, viz., the right to make such examination leading, thorough, and exhaustive, and the fact that the evidence thus educed, while pertinent to the pending matter, will also help defendant's case is no ground for its exclusion. But he does not touch at all upon the other point in the rule as given by Greenleaf, 1 Ev. 447, that though a party may not before opening his case introduce evidence by way of cross-examination of the witnesses of the adverse party, yet he may do so after opening by recalling them for that purpose.

We have only one objection to the rule as stated by Judge

Garber, and that is the difficulty of applying it with cer-
tainty in the hurry of *nisi prius* trials.   The test as to
whether matter is or is not new matter of defense is, can it
be given in evidence under a general denial, and very often
it is not easy to say, at a moment's notice, whether the
matter is new or not, in this sense.   The rule would hardly
forward business on the trial.   There would be the same
objection by counsel as to admissibility, the same consump-
tion of time in argument, and the same hesitation on the
part of the court to decide; but there is this advantage,
after the trial is over all parties know just what is neces-
sary to determine whether an appeal will lie or not; they
know where the line is drawn; they can look for it, and
when they find it they know that they have struck "wall
rock," and that it is useless to go further.   This is a great
deal better than trusting to some other man's idea of the
general equities of the case.   Still, it is a very poor substi-
tute for the plain, simple English rule, which avoids all
possibility of dispute, saves all contention at the trial, dis-
patches the business at once, and yet, according to the
testimony of our oldest and busiest states, hurts nobody.
Nevertheless, the supreme court of the United States has
discarded the English rule, and has furnished some sug-
gestions for a new rule, which different states have accepted
as a basis on which to build up what is called, by way of
distinction, the American rule, though it has hardly re-
ceived an adoption sufficiently general to warrant such a
title.

These suggestions have been adopted in California and
Nevada, and our intimate relations with these states leads
us to believe that, on the whole, it will be more satisfactory
to all parties interested to have our practice in harmony
with theirs.   As the matter of determining rules on these
matters is almost universally left to the courts, and as it is
exceedingly desirable to have something definite on the sub-
ject, we shall adopt the following rules, believing them to
be clearly in accordance with the doctrine held in Nevada,
and substantially in accordance with the practice in Cali-
fornia:

1. When an adverse witness has testified to any point
material to the party calling him, he may then and there be

fully cross-examined and led by the adverse party upon all matters pertinent to the case of the party calling him, except exclusively new matter; and nothing shall be deemed new matter except it be such as could not be given under a general denial.

2. The fact that evidence called forth by a legitimate cross-examination happens also to sustain a cross-action or counter-claim affords no reason why it should be excluded.

3. The party entitled to cross-examine may waive his rights to do so at the time, and recall the witness and cross-examine him after he opens his case.

4. The court, in its discretion, may forbid the cross-examining party putting leading questions when the objection is made that the witness is biased in favor of the party cross-examining, and the court is satisfied that the objection is good.

Under this view the assignments of errors from one to five inclusive are good. The questions were improperly excluded. They merely tended to show that the title to the premises was really in the defendants, and not in the plaintiffs. In ejectment it is not new matter to set up defendant's title. *Marshall* v. *Shafter*, 32 Cal. 176. It was error generally to exclude the questions, because no valid grounds of objection were stated. A general objection is bad.

*Errors* 6, 7, 8.—The court erred in rejecting the evidence offered by defendants to prove that plaintiffs knew that the work on the claim had been done by Linn, and that they had examined the records and knew of defendants' title to the premises in question. 1. Because no specific objection was made to the introduction of this evidence. 2. It was evidence tending to show title and possession in defendants, and was therefore not new matter, as was ruled in 32 Cal. 176.

Parties must distinguish between new matter and new evidence, between new matter of defense and new facts and circumstances connected with plaintiff's case. A new fact properly brought out is in one sense a new matter, but it is some matter connected with plaintiff's case which goes to break down the case he is attempting to make, and so long as

it is not exclusively new matter of defense which could not have been offered under a general denial, it is admissible. We do not mean that this evidence was proper because it might show that plaintiffs had notice of defendants' title; but whether proper for that purpose or not, it was proper for defendants to show by these witnesses, as well as by any others, that they had located and recorded the claim and had done work upon it. The questions were *directed to* facts going to prove title in defendants, and such proof, if made, would have been in direct denial of plaintiffs' allegation that the title was in them, and therefore was not new matter of defense.

*Error* 11.—The court erred in rejecting the question, "What authority, if any, did you ever give Mr. French to make locations of mining claims for you in this territory prior to location of the Tiger mine," because no specific objection was made to the question; and herein becomes painfully apparent the consequence of bringing a question before us in this form, because we can not strike at the heart of the matter upon such an objection. The object of an appeal is to settle something, so that, when the case goes back, the parties can know where they stand as to the questions raised on appeal. What can we settle on this question? Are we to go into an examination as to whether this question is leading or not, or whether it was a proper question to ask the witness at the time it was propounded, or whether it was immaterial or irrelevant at any time? We can not guess as to which of these points counsel desire a ruling; but as no authority is necessary to enable one to locate a mining claim for another, we think that the question might have been excluded as immaterial, if objection had been made on that ground. But though immaterial so far as authority to locate being necessary was concerned, it might have been material for some other purpose, and therefore, if objected to as immaterial, the particular reasons why it was claimed to be immaterial should be stated.

*Error* 12.—The court erred in excluding evidence of the contents of the letter from Linn to French, which accompanied the deed and power of attorney to French, because no specific objection was made to the introduction of such evidence. This evidence stands in one respect on much the

same ground as that objected to in the last exception. We can not tell what objection plaintiffs had to it; whether that it was immaterial, or that sufficient foundation had not been laid for its introduction. We think that the foundation was sufficiently laid. We must distinguish in these matters as to the character, occupation, and business habits of the person claiming to have lost a paper, and as to the importance of the paper itself.

If the witness were shown to be a lawyer or business man, with an established office, or place to keep his papers, and who claimed to be unable to produce an important document received by him in the course of business, we would hold him to very full proof of loss and search; but if it were an unimportant document, one of trifling value to anybody, we could not hold him to such full proof. But the witness in this case was shown to be a wandering miner, a prospector who moved over the whole mineral region west of the Rocky mountains, flitting hither and thither at a moment's notice, according as the mining excitement raged in one part or another. Naturally, we would not expect such a man to carry many papers about with him. He testified that it was his custom to burn all letters as soon as answered. He said that he could not find this letter, and supposed that he had burned it, as was his custom. It is true that the proofs of search were not very full, and would not have been sufficient in the case of an ordinary business man with an established place of business, or residence, as to a document received by him in the ordinary course of business, but in this case we think that it was sufficient. We do not see, though, how it was material, but no objection was made on that ground.

*Error* 13.—The court erred in rejecting the question, "For what purposes did you request Linn to send you a deed of premises in controversy, or power of attorney?" because no specific objection was offered to such evidence.

*Errors* 14–26.—The court erred in rejecting the evidence offered, because no specific objection was urged against its introduction. So far as the evidence was offered to rebut the presumption of fraud in using Linn's name as a locator, with the expectation that he would convey his title to French, or Moreland, the parties who made the location for Linn, it

might have been successfully objected to as immaterial, because no presumption of fraud arises from such a fact. It is no fraud on anybody for one man to locate another in a mine, and receive back from such person a deed to the property, having made no misrepresentations to such person as to such transfer. Nobody is injured by such a proceeding. The law and customs of miners permit persons to make locations for persons not present. When so made, all the title anybody can acquire by location vests in the persons so located. They can not be divested of it except by their own voluntary act, or by forfeiture in not complying with the rules and regulations of the district. The title thus acquired is theirs to dispose of as they please. They may bargain, sell, transfer, or give it to whomsoever they like. By having once been located in the claim, their right to acquire any further interest in the discovery by location is exhausted. The fact of their non-residence is immaterial, unless the contrary is expressly declared in the rules and regulations of the district. Whether the miners would have power to disqualify non-residents from being located is, of course, not passed upon here; but when there is no attempt at such disqualification, non-residents stand in the same position as those in the district. They must contribute to the development of the district by working their claims, or paying the fees, the same as those present, and it has been the policy of miners to encourage such locations rather than look upon them with disfavor. It causes their mining district to be known abroad, and furnishes additional means for its development.

*Errors* 27, 28, 29.—The court erred in rejecting the evidence as to the declarations of plaintiff's grantor relative to the grounds on which she based her title, viz., that she expected to hold the premises because Linn was a non-resident, and that therefore his location was not good because no specific objection was urged against such evidence. Evidence on this point would have been material and admissible if it formed a part of the *res gestæ*. The witness was the immediate grantor of the plaintiffs; declarations of a grantor as to the nature of the title he asserts, when they go to limit his title, are admissible, not only against himself, but as against parties claiming under him. *Stanley*

v. *Green,* 12 Cal. 148. The reason of this rule is that when a person admits anything against his own interest, he can not claim that such admission is unworthy of belief. He can not object to it as insufficient evidence against himself, and his grantees take his interest in the premises *cum onere.* If this were not so, a party could always avoid his own admissions by simply deeding to some one else. But these admissions must be contemporaneous with the fact to which they relate. The material fact in the case of this exception is not the mere act of Mary Sawyer placing the notice on the mine, but the grounds on which she based her title. As long as she claims title to the premises she is supposed to be interested in maintaining that title. Any admissions made by her as to her title during the time she claimed it, which would go to limit, impair, or modify that title, must be admitted as against her and her grantees. But the moment she has parted with the title, she becomes a stranger to the contest, and her remarks as to the title, made after she has ceased to claim under it, are of no consequence. She may be interested, then, in decrying the title. The evidence sought to be introduced went to show that she knew that defendants had already located the premises, and the reason assigned by her why she thought defendants' title not good was the simple fact of non-residence. Such evidence might often be of great importance. Defendant has a right to show title under a general denial. The record of this title may be lost. He may have no witness to prove that he was located. He may have been, as in this case, a non-resident at the time he was located. The party who located him may be dead or inaccessible, and then an admission of a would-be ejector that defendant was in fact located, but that there was a question whether he was entitled to hold or not, might be decisive of the whole case. The jury might find that, the location being admitted, he was entitled to hold, notwithstanding his non-residence.

*Errors* 30, 31.—These assignments of errors are practically the same as 7 and 8. In 7 and 8, Davis, one of the plaintiffs, testifying in the opening in his own behalf, was asked by defendants in cross-examination if he did not know that defendants had worked and recorded their claim. Objected to and excluded. Subsequently de-

fendants, after opening their case, called Davis as a witness, and asked him the same questions.   Objected to by plaintiffs.   Objection sustained.   Defendants except, and assign errors 30 and 31.   It was error to exclude the testimony: first, because no specific objection was made thereto; and second, for the reasons given in considering points 6, 7, and 8.

*Errors 32, 33.*—The court erred in excluding the evidence of Collier and Henry as to mining customs, because no specific objection was made thereto.   The question asked of Collier was open to objection, as being too general for the foundation laid.   He showed a knowledge of the customs of Yavapai county alone, and was asked as to general customs without limitation to place; but to raise the point, the special ground of objection should have been stated. The effect of such an objection, we may naturally suppose, would have been to limit the question to that county, and then there would have probably been no appeal on this point.

Question 33 to Henry seems to us free from objection as to lack of foundation, but in any event, as no particular objection was urged, and the question seems proper, it was error to exclude it.

*Errors 34, 35.*—Plaintiffs introduced proof of an agreement between Thorne and Cassidy, on the one part, and Moreland, an owner in the original Tiger claim, on the other, whereby Moreland was to locate for them four hundred feet next north of the premises in controversy, on condition that they would deed back to him one half of the ground, and that the agreement was fully carried out.   Defendants objected, were overruled, and assign therefor errors 34 and 35.   The objections were properly overruled, no specific grounds of objection having been stated, and we can not say that the testimony might not have been admissible for some purpose.

Counsel for plaintiffs urge here that the testimony was relevant and of weight, as relating to an attending circumstance going to show a fraudulent intent of the original locators of the Tiger in trying to hold, by this agreement, more ground on the claim than they were entitled to retain by location; and that such a circumstance, if proved as

A. T. Reps. I—10

to the Thorne and Cassidy claim, would tend to raise a presumption, taken in connection with other circumstances, that the same thing was true as to the Linn location. We will notice the point in considering assignment No. 44.

### INSTRUCTIONS.

*Error* 36.—The refusal of the court to give the concluding clause of defendants' second instruction was in effect a refusal to charge, that, a claim being located according to local rules and customs, a failure to comply with such rules as to making and holding the claim would not of itself work a forfeiture, unless such failure was of itself ordained by such rules and customs to be a forfeiture. This was error. The general rule is that a statute without a penalty is mere *brutum fulmen.* The miners are recognized as law-makers in the matter of their rules and customs. When they prescribe a duty and affix no penalty for non-compliance, how are we to know what penalty they intended? For us to fix the penalty would be to make laws for them, which we have no right to do. The province of the courts in this matter is merely to receive the evidence, and from it to declare what laws, or rules, the miners have in fact adopted. Courts do not presume in favor of forfeiture; but on the contrary, when parties claim a forfeiture, under the mining laws, these laws, instead of being liberally construed to establish the forfeiture, will be strictly construed as against it. *Colman* v. *Clements,* 23 Cal. 248. The failure of a party to comply with a mining rule or regulation can not work a forfeiture unless the rule itself so provides. *Bell* v. *Bed Rock T. & M. Co.,* 36 Cal. 219; *McGarrity* v. *Byington,* 12 Id. 426; *English* v. *Johnson,* 17 Id. 118.

*Error* 37.—Defendants asked the court to instruct, that "if the defendants were in the possession and occupancy of the claim in controversy at the time plaintiffs' grantor attempted to make her location, no right was acquired by such location." The court refused to give this instruction, but gave in its stead another and very different one, by inserting the words "located and lawfully" before the words "in the possession." This was calculated to seriously mislead the jury. It was the same as to say to them that possession and occupancy were not sufficient unless accompanied by a formal

location, and that in addition to location the possession and occupancy must be lawful. This, so far as it related to possession before May 10, 1872, was error, and the possession claimed in this case was before that time. Before that time, possession and occupancy, so long as they continued, were sufficient to hold a mining claim against a would-be subsequent locator. The main object of recording a claim is to give parties the opportunity of ascertaining, by visiting the records, what ground is claimed in the district. The only object of putting a notice on the claim is that it shall speak for the owner in his absence, and to give notice to parties coming on the premises that some one has claimed them; but if the party is there himself, in possession and occupancy of the claim, by himself or his agent, he gives the parties fully as much notice as they could derive from inspecting a slip of paper. If it be suggested that a written notice speaks with more certainty, the answer is, that it is doubtful if that be so. A notice never does more in regard to boundaries than to describe the length of the claim. A party claiming to hold by mere actual possession must mark his boundaries by such distinct physical marks-or monuments as will indicate to any person what his exterior boundaries are, and he must occupy within them, or do work which is intended to affect the premises; and he is bound by any declaration he may make as to what his possession covers, in this, that he can not hold more than he claims. If he claims more than the law allows him, a stranger may locate the surplus just as he could in case a written notice claimed an excess. Of course, if the miners had legislated upon the subject, and in their local assemblies, known as miners' meetings, had adopted a law that mere possession should not hold against a party regularly locating under the laws, then such possession would not prevail as against such subsequent location; but in the absence of such law—and its absence is presumed until the contrary is shown—actual possession is good so long as it lasts.

Before 1866, the courts, of their own motion, adopted the rules, regulations, and customs of miners as a standard by which to determine issues arising between such miners. But from July 26, 1866, to May 10, 1872, which covers the possession and occupancy involved in this case, citizens,

and those who had declared their intention to become such, were, by act of congress, permitted to explore and occupy mineral lands of the public domain, subject to such regulations as might be prescribed by law and the local customs or rules of miners in the several mining districts, so far as the same were not in conflict with the laws of the United States. Here was as absolute a grant of legislative power given to the miners themselves as congress ever gave to the legislature of any territory—or rather much larger, for there was no local veto that could nullify their acts. The customs, rules, or regulations of miners were thus given, with the limits named, the full force of legislative enactments, as binding upon the courts of this territory as any law of the legislature, and subject to the very same rules of construction. It gave in this country probably the first example of the pure democracies of ancient times as seen in the Grecian states, when the citizens made their laws, not through the medium of representatives, but by assembling in person and directly declaring their will in the matter. These laws come directly from the source of all political power, the people themselves duly authorized to act in this manner, and this is why they have just as much solemnity and binding force as though they had been enacted by representatives of the people instead of the people themselves.

The questions as to rules or customs, thus adopted, are the same as with any other legislative acts presented. Did the act, or rule, become a law? Was it in force at the time claimed? What is the meaning of the words used? What rule do they establish? How does that law or rule affect the case? Up to May 10, 1872, there was generally no limit to the power of the local legislatures known as miners' meetings, except the general principles of law.

During this time, then, actual possession was good, so far as it did not claim more than the law allowed, it not being shown that a failure to comply with the rules by posting a notice, recording, working, etc., was of itself declared to work a forfeiture. Since May 10, 1872, there are some restrictions upon the powers of miners to legislate.

The United States act of May 10, 1872, prescribes some conditions as being necessary to sustain a possessory title, and expressly declares that a failure to comply with those

conditions will of itself work a forfeiture, and leave the premises open to relocation. But those provisions do not apply to this case as to the points now in hand. It was also error to insert the word "lawfully" as qualifying the possession and occupancy of the premises in controversy, without explaining what force or meaning it was intended ·the term should have. *People* v. *Byrnes*, 30 Cal. 206. Legal terms must not be used without explanation. There is a great necessity for this rule. The law is full of expressions familiar as household words to a lawyer, but no more intelligible than so much Greek would be to the average juror. Not to go back to the old books at all, but to take the language of judges in our own country, in comparatively modern times, it may be, and doubtless is, perfectly correct to say that the devisee of a remainder in fee, after death of tenant for life, formerly had remedy by formedon in remainder, or on entry after death of donee for life, by writ of entry declaring on his seisin: *Wells* v. *Prince*, 4 Mass. 66; that in double pleading to writ of entry sur disseisin, first plea, nul disseisin, second in bar, that plaintiff was never .seised, second is bad: *Martin* v. *Woods*, 6 Id. 6; that a plea of nontenure in formedon without remainder is good: *Prout* v. *Libby*, 14 Id. 151; that in a writ of right a plea of seisin to save an easement is bad, for confessing easement alone confesses non-seisin: *Miller* v. *Miller*, 4 Pick. 244; that darrein seisin is good against a writ of right: 3 Wheat. 175; that generally a descent cast tolls the entry, but the equity of the *jus postliminii* sometimes saves the right to an infant heir: 10 Johns. 357; that in pleading a common recovery as sued to the use of the tenant in tail, who was to the *præcipe*, it is not necessary to show that the indenture to lead the uses was executed by him: *Dow* v. *Warren*, 6 Mass. 328; that in California, defendant in ejectment must set up subsequently acquired title as in the plea puis darrein continuance: *Hardy* v. *Johnson*, 1 Wall. 371; or that under the plea of non-tenure with disclaimer and issue to the country, with or without finding for the tenant, plaintiff is not entitled to possession: *Porter* v. *Rummery*, 10 Mass. 64; but if it be a plea of nul disseisin only, in a writ of entry by a trustee against a *cestui que trust*, plaintiff may recover: *Needham* v. *Ide*, 5 Pick. 510; but it would be a hardship to suitors to instruct a jury in

such language and then say to them, "Gentlemen, this is the law .of the case; you are bound to follow it, and render your verdict accordingly."

Why should not this language be used ? It is English by adoption and use; it is clear, forcible, exact, and terse beyond any colloquial words which can be found; but the trouble is, the jury might not understand it. It was necessary, therefore, to adopt the rule that legal expressions should not be used without explanation in such cases. The term "lawful" may seem simple enough for any comprehension, but day after day is often spent in the sole effort to determine whether a certain act was lawful or not. It would be manifold error to instruct, without further explanation, "if you believe that the defendant lawfully killed the deceased, you will acquit," for that is to make the jury the judges of the law. And so of the use of any legal term; if it is reasonable to think it may have misled the jury, the use of it without explanation will be error.

*Error* 38.—Defendants in their sixth instruction asked the court to charge, "that the subsequent ratification by Linn of the location by him gave the location the same effect as if made by himself." Given with the qualification added, "unless a valid location by some other person had in the interval between the location of French and the ratification by Linn been made and perfected." Thus saying, in effect, that the title in an absent locator does not become perfect until he has knowledge of it and ratifies it. This was error. When a location is made for an absent locator, whether with or without authority, or with or without his knowledge, whatever rights are given to him by such location vest in him at once, and even the person locating such absentee, without authority, can not take down the name of such absentee and insert another, even if he do it before the absent locator has knowledge of the fact that he has been located. *Morton* v. *Solambo C. M. Co.*, 26 Cal. 527.

*Error* 39.—The court refused to give the words in defendants' seventh instruction, "and a location made by one person for and in the name of another vests a right in the one for whom the location is made, which can only be divested by his own acts or omissions, or by operation of law." This was error. *Morton* v. *Solambo C. M. Co.*, 26 Cal. 527. The

court added the words, " but some authority, express or implied, must exist, or the agency must be ratified before other valid claims intervene." This was error. It tended to mislead the jury. As a matter of law, there is implied authority in the very act of making the location, but it tended to impress upon the jury that some other authority was necessary. None other is required. *Morton* v. *Solambo C. M. Co.*, 26 Cal. 527. Counsel for respondents urge that a mining claim is an interest in lands within the meaning of the statute of frauds, and that it can not be created without authority in writing. The point is not fairly before us, and we will dismiss it with the remark that the object of the statute is to guard the owner of an estate in lands against any new estate in the same property being created for another out of the estate of the owner, except by the operation of law, or by his written consent.

This writing is to be signed by the party *creating* the estate, or by some one having written authority to do so. The party who locates a mine *obtains* an estate therein by such an act, but it is not he who creates that estate. Whatever estate he obtains, he derives from some source. There is a proprietor of the land above him. This proprietor says to the locator, Do thus and so, and you may have a certain estate in the mine. The locator performs the act and obtains the estate, but it is the proprietor who creates the estate in him. If another person places a notice on the claim, that other person does not thereby create an estate for anybody. He has no estate in the premises out of which he *can create* an estate for another. He is merely performing the acts which are a condition precedent to the creation of an estate in the premises by the real proprietor. It is only after the estate comes into being in the locator that the statute of frauds as to his acts in creating estates in the premises for others applies. The court, in refusing plaintiffs' instruction on this point, ruled correctly.

*Error* 40.—The eighth instruction of defendants was refused, and was as follows: " The law makes the discoverer of a mine the agent for those for whom he chooses to act, and his act becomes their act, regardless of the fact whether the party for whose benefit the location is made has any knowledge of it, or not. In such cases, however, the agent

making such location has no power afterwards to make any change in the same, so as to affect injuriously the rights of the party for whose benefit the location was made. A failure to comply with the local rules or customs of the district will not work a forfeiture, unless such failure is declared by such rules or customs to be a forfeiture."

This instruction is obnoxious to criticism in this, that it contains two distinct legal propositions relating to entirely different questions. Still, it stated the law correctly as to all cases arising before May 10, 1872, of which this was one, and it was error to refuse it. The territorial law, declaring forfeitures for non-compliance with its requirements, was repealed in 1866, and no other law declaring forfeitures was enacted until the United States act of May 10, 1872. The latter portion of the instruction as to forfeiture would require modification, but it was correct as to cases arising between 1866 and 1872.

*Error* 41.—Plaintiffs asked for the following instruction: "3. If you believe from the evidence that plaintiffs were in possession of the premises in dispute, and that defendants entered and ousted them therefrom, you will find for plaintiffs, unless the jury believe from the evidence that defendants had a better right to the possession than that of plaintiffs;" which was given.

This instruction raises the question as to what plaintiff must show in order to entitle him to recover in ejectment. The answer is, He must show a right of possession. Formerly he was obliged to show, not only a right of possession, but also a valid, legal, subsisting title in himself at the commencement of the action. Showing even an equitable title was not sufficient: Adam's Eject. 32; Lord Mansfield, in *Atkyns* v. *Horde*, 1 Burr. 119. It was formerly the rule, without any qualification whatever, that any defendant, no matter under what circumstances he entered, might defeat the action by simply showing an outstanding title in some one else than the plaintiff, even though the defendant did not in any way connect himself with that title. This was the logical sequence of the rule that plaintiff must recover on the strength of his own title: 3 Com. Dig. 553; that, therefore, it mattered not in what way defendant showed that plaintiff was not within the rule; if he showed it, that was sufficient

to defeat the action.  This doctrine was held in our United States supreme court as late as in *Love* v. *Simm's Lessee,* 9 Wheat. 515.

The learned judge who delivered the opinion in that case felt that there might be some force in the objection; that it was extending too much consideration to tort-feasors, mere naked trespassers, to give them the benefit of such a rule; but he remarked that such cases must be of rare occurrence, and that it was time enough to consider them when they arose. The judge evidently never lived in a mining country; that is, one where the "jewels of sovereignty," the precious metals, were the subject of contention; where it is not uncommon for a man to retire at night from premises of which he has had peaceable possession for years, and on his return next morning find strangers encamped upon his grounds, with barricade erected, shot-guns and six-shooters displayed with reckless prodigality, and a wild-mannered captain accosting him with the bland salutation, "Don't you think it would be healthier for you to keep away from here, my friend? We don't want to hurt you, you know; but we have been requested to retain possession of these premises." The gallant captain himself would admit that we had outdone him in courtesy if we were to give him the benefit of the rules as applied to *bona fide* innocent holders, claiming under color of title.

The first case of tort-feasor presented in the supreme court, subsequently, was from the Texas border country in *Christy* v. *Scott,* 14 How. 292, and the court then modified the rule so as to declare that a mere intruder, entering without any claim of title upon the peaceable possession of another, and ejecting him therefrom, can not then question the title of the party dispossessed, nor can he undertake to show that the real title is in somebody else.  He has made a contest simply on possession, and if plaintiff shows a prior peaceable *bona fide* possession, and the defendant shows nothing but his mere intrusion, the plaintiff shall have judgment.  But if the defendant entered under color of title, under a claim of right, he is not under the ban, and he may rebut the plaintiff's claim of title, or right of possession, by showing that it is in himself, or in another, subject, however, to one additional limitation, which it was found necessary to adopt in California.

In California, and other mining countries on the Pacific slope, the general government refused for a long time to grant any title to the mineral lands, but tacitly acknowledged a license to work the mines, raising a kind of tenancy at will in the first occupier. The courts found it necessary to declare that this *bona fide* prior occupation should be sufficient to maintain ejectment against any one not connecting himself with the paramount title; that the possessory title sufficient to maintain the action vested in the first possessor and flowed from him. The defendant was not prevented from showing that the possessory title was outstanding in another, but merely showing that the paramount title in fee was in the government was not sufficient. This rule is stated in *Coryell* v. *Cain*, 16 Cal. 573, and the reasons most lucidly given by Mr. Justice Field, who did so much in California to add to the glory of the common law, by showing how admirably the animating principles of its apparently rigid rules could be applied to the newest and strangest condition of society.

There are two kinds of possessory rights recognized in this territory; one based on the act of November 9, 1864, Compiled Laws, p. 536, the other resting on mere prior occupation. To maintain a right under the first, plaintiff must show a compliance with the requirements of the statute; to succeed under the second, he must show prior possession, without alienation or abandonment, down to the time of the entry complained of. The action of ejectment is a possessory action, and possession always raises some presumption of right. Plaintiff begins in ejectment, as to this matter, by averring that he is entitled to the possession, that the defendant has the possession; then he undertakes to overcome the presumption flowing from defendant's acknowledged possession, by showing that defendant obtained that possession wrongfully by entering upon the possession of plaintiff. If the matter stop here, plaintiff must recover; but if defendant show in reply, as here, that plaintiff obtained his possession by entering on the possession of defendant, presumption is shifted again in favor of defendant; then, unless plaintiff can go higher in the history of possession, and bring the presumption back in his favor, he does not, through proof of possession alone, put the defend-

ant upon his defense at all, and if this be the end of the showing made by the plaintiff, he must fail. But plaintiffs did not stop here in this case; they showed color of title; to wit, a notice of location of the premises. Defendants replied by showing an earlier notice of location for the same ground.

Here, then, was a case where plaintiffs, according to the evidence, had failed so far as a naked possession was concerned, for defendants showed a prior possession. The question then stood as between the parties as to the effect of plaintiffs' notice of location. Instructions should be in harmony with the proof in the case. It was, therefore, error to instruct the jury, "that if they believed from the evidence that plaintiffs were in possession of the premises in dispute, and that defendants entered and ousted them therefrom, they will find for plaintiffs, unless they believe from the evidence that defendants had a better right to possession than that of plaintiffs." This instruction, we may reasonably infer, led the jury to believe that the mere fact of possession by plaintiffs at the time of the ouster gave them, under the evidence in the case, a *prima facie* right to recover. This was not the law, because the presumption flowing from that possession by plaintiffs had been met and overcome by defendants when they showed an earlier and continuing possession under an earlier location of the same premises. The qualifying clause as to their belief of defendants' better right did not save the instruction, because the jury, we may reasonably believe, were misled as to the condition of defendants on that issue, and as to what *onus* of proof was on them. Any charges given to the jury as to the effect of possession in this matter should have informed them that if they believed defendants had shown a prior and continuing possession, all presumptions, so far as mere possession was concerned, were in favor of defendants. As this case goes back for a new trial, and as the conflict will probably be as to the effect of the two notices, and as the case has already been here twice, it may be well for us to remark, that any charge given concerning the notices should be given with careful regard to the evidence adduced respecting them, and that the jury be instructed as to what the effect will be in law upon the rights claimed under the notices, according as they believe any particular set of facts

has been proven, and not leave it.to them to say generally which they consider gives the better title.

*Error* 42.—The court gave the following instructions at the request of the plaintiffs: "If the location of the mining claim in question was made in the name of Linn by Moreland and French, or either of them, for the purpose of having Linn convey to them, or either of them, the whole or any part of said mining claim, without further consideration, Moreland and French having already located two hundred feet each on the same lode, and that Linn ratified the act of location for the purpose of making such conveyance, such location was void, as a fraud and evasion of the law." There is nothing in the record tending to show that French ordered the location of the claim to be made for Linn for the purpose of having the whole or any part of it deeded back to him or Moreland, without further consideration, nor is there anything tending to show that Linn ratified the location for the purpose of making any such conveyance; on the contrary, the evidence is directly the other way so far as it raises any presumption on this point. The evidence is, that as soon as the location was made, French advised Linn that it was of great value; that the vein was twelve feet wide, assayed one thousand three hundred and fifty dollars per ton silver, and that he thought that the location made for him (Linn) would be good for ten thousand dollars in less than a year. Fifteen days afterward, he again wrote him, speaking more enthusiastically than before of the value of the claim, saying that it was from twelve to twenty feet wide, averaging one thousand dollars per ton, smelting process, assaying two thousand dollars per ton, to have no fears, that their claim would be worth one hundred thousand dollars in less than a year; that he would write for Linn to come as soon as he thought it necessary, but in the mean time he wanted the deed without delay, in order to have no doubt about being able to protect their claim. Linn came on from Nevada some four or five months after, and then French deeded back to him half the ground. Linn testified that it was at his, Linn's, request that French kept the other half of the ground in his, French's, name as security for Linn's indebtedness to him. This is, so far as we can see, all the evidence as to the motive French had in getting the

deed for this ground from Linn.  Does it tend in any way
to raise a presumption that possibly French was trying to
commit a fraud on some one, by trying to get a deed of this
ground to himself without consideration?  We can not find
anything in the record to show that he underestimated the
value of the location in his representations to Linn.  In the
first letter of advice, which it is shown was received by Linn
before he made the deed, he gave his opinion that Linn's
claim was worth, or would be in the course of a year, ten
thousand dollars.  Fifteen days later he wrote a letter, which
it was shown was received by Linn before he sent the deed,
in which he says, "our claim will be worth one hundred
thousand dollars in less than a year."  We do not know
exactly what he meant by that, but if we are to consider the
evidence for the purpose of saying what inference might be
drawn from it, we would infer that, as each one of them had
a claim of two hundred feet on the vein, the meaning was that
their claims were by him considered to be worth fifty thou-
sand dollars apiece.

We do not think that this evidence raised any question
in the case as to French's honesty of intention in the matter
of making the location for Linn, or that he expected to get
possession of the premises from Linn without consideration.
We are not speaking of the weight of evidence.  If there
had been any conflicting evidence on this point, a question
might have been raised for the jury to determine whether
French had made these representations or not, whether he
had in fact deceived Linn as to the value of the premises,
and whether the deed Linn made to him was an absolute
conveyance instead of a trust, and whether that was fraud.
Even in such case, if they had found fraud, it would only
have been a fraud of French upon Linn; would have left the
whole title in Linn, and so would not have helped the plaint-
iffs.  But there was no evidence raising such a question
in the case, and therefore the instruction had no relevancy
to any question involved in the issue.  It is never error for
a judge to refuse an instruction under such circumstances.
Whether it is error to give such an instruction, depends upon
whether it is calculated to mislead the jury or not.  If it
appear at all probable that a superfluous instruction might
have misled the jury so as to materially affect their verdict,

then it is error to give it; and when error is shown, injury is presumed, unless the contrary plainly appears. This instruction might have misled the jury. It invited them to consider and pass upon a question of fraud not raised by the evidence. Such consideration might have prejudiced the defendants, and therefore the giving of the instruction was error.

*Error* 43.—The following was given as an instruction by the court: "If the location of the mining claim in question was made in the name of Linn, by Moreland and French, or either of them, for the purpose of having Linn convey to them, or either of them, the whole or any part of said mining claim, without further consideration, Moreland and French having already located two hundred feet each on the same lode, the location was absolutely void, as made in fraud and evasion of law."

1. There was nothing in the evidence on which to raise any presumption that French or Moreland had located the premises with such expectations, and the instruction was therefore irrelevant. It was likely to mislead the jury, to the prejudice of the defendants, because it said to them, in effect, that there was such a question involved, which they should pass upon, and therefore the giving of it was error.

2. Even if the evidence had left it an open question whether French or Moreland had an expectation of getting the ground deeded to them without consideration, that is, getting a deed of gift to the premises, and had made the location for that purpose, it was error to instruct that such location would therefore be absolutely void. The location put the title in Linn, to dispose of as he pleased. Even if the parties locating him had expected that he would deed back to them for nothing, and made the location because of that hope and belief, Linn might have been ignorant of such intention and expectation, and might have declined to gratify it. His title depended upon the fact of location, not on the intention the parties locating him might have had in their own minds at the time. A person locating for an absentee, in the hope that the latter will give away the right thus secured for him, takes the chances as to whether h᷑ will give it away or not, and as to whom he will give it, if he gives it at all. In case a located person knew in advance that the object of using

·his name was to enable the person using it to hold more feet on the lead than he could acquire by location under the laws, and consented to such use of his name for that purpose, the question as to whether such an arrangement between the parties would be a fraud sufficient to vitiate the location is not before us.

The question as to the propriety of the second instruction of the court is practically considered in errors 41, 44, and 45.

The forty-fourth and forty-fifth assignments of error are, that the court erred in not granting a new trial, because, it is claimed, the evidence is insufficient to justify the verdict, and that the verdict is contrary to law. Of course the general rule is well established, that, no matter how much evidence the transcript discloses against the verdict rendered, if it shows sufficient evidence in support of the verdict to raise a substantial conflict with the evidence on the other side, this court will not interfere. For when there is a substantial conflict of evidence, it is the province of the jury to weigh the evidence and decide which side is entitled to prevail.

The transcript in this case embodies all the evidence that was given, and sets it all out with wearisome particularity in the exact words as given by the witnesses—a most objectionable and reprehensible manner of making up a statement. Considering the roundabout way in which most witnesses generally tell their story, and the mass of trifling and irrelevant matter they interweave with their statements, a lawyer, when he comes to present to the supreme court a statement of what has been proven on the trial, should not follow the words of the witness, but should state succinctly what evidence was given which is material on appeal. There may be nothing in the testimony of the witness affecting the appeal, and if so, his narrations should not be thrust upon us to consume our time and exhaust our patience. In this case, about two hundred folios of oral testimony have been sent up, when the whole statement could have been much more clearly presented in the compass of thirty or forty folios. But counsel very considerately caused the transcript to be printed, though not obliged to do so. Had they not done so, this case could not have been examined in time for the approaching term of the court below. Now,

as to whether there is a substantial conflict of evidence in this transcript: all presumptions as to possession were overcome as to plaintiffs, because defendants showed a prior and continuing possession down to the beginning of plaintiffs' possession. Plaintiffs were then put upon their right of possession. They introduced paper title—a notice of location. Defendants proved a prior location.

The whole issue turned, then, on the question as to whether plaintiffs' notice was good. Plaintiffs made but two objections to defendants' notice, charging: 1. That it was fraudulent; that, if not fraudulent, it was void, having been made without authority, and therefore void *ab initio*. 2. There being no other issue before the jury, in finding for plaintiffs they declared that defendants' location was either void for fraud or void from want of authority to locate.

We have read the transcript over repeatedly and carefully, and we can not find any evidence at all which raises a question of fraud, or which tends to raise a presumption of fraud, even granting that the evidence proved the facts which plaintiffs claimed constituted the fraud.

Granting that the agreement between Moreland, individually, and Thorne and Cassidy, as to the latter deeding back half of the ground in consideration of a location being made for them was fraud, it is a long way from that fact to the conclusion that Linn's location is open to the suspicion of fraud. This is the only evidence taken in connection with the nature of the relations and transactions between Linn and French, from which respondents claim proof of fraud.

The conclusions respondents seek to draw are that this agreement showed a desire upon the part of the original Tiger Company to get more ground than they could hold by location; that they took the south half of the Thorne and Cassidy claim, which was the half nearest the original location; that Linn's location lay between; that it was made by French without Linn's knowledge; that, therefore, it was the intention of the Tiger Company to have Linn's location at the time it was made. To this, the first answer is, the whole vein was open to location at the time the original location was made; the locations were all made the same day and by the same person. The original locators took only

one thousand two hundred feet. If they had wanted more ground, they could have taken it, even to the extent of three thousand feet. The very fact that they did not locate for themselves the two hundred feet of Linn's location and the south two hundred feet of the Thorne and Cassidy claim, if it shows anything as to this matter, shows that the original locators did not want that ground in their company. Second, the agreement with Thorne and Cassidy was not an agreement by them with the original locators of the Tiger, but with the individual named Moreland, and it was not an agreement for the south half any more than for the north half. It was not an agreement to segregate any particular part, but simply an agreement to convey to Moreland one half the premises. Moreland, for reasons which are not explained in the record, got Thorne and Cassidy to consent to segregate the south half of their claim, and also, for reasons not explained, or in any way alluded to in the record, gave the original locators the benefit of his agreement with Thorne and Cassidy, and had the deed from them for that half-interest made directly to the original locators on the vein. But there is nothing to show that Linn knew anything of this, or that he consented to any plan they might have had in regard to his location. We do not see in these facts anything which even tends in any way to taint Linn's location with fraud of any kind. If the verdict of the jury was based on the theory that the evidence did not show authority for the location, it should be set aside, because no proof of authority was necessary. The new trial should have been granted.

Judgment reversed and new trial ordered.